**UNITED STATES of America,
Plaintiff, Appellee,**

v.

**CUMBERLAND FARMS OF
CONNECTICUT, INC.,
Defendant, Appellant.**

**No. 86–1983.**

United States Court of Appeals,
First Circuit.

Heard April 9, 1987.

Decided Aug. 18, 1987.

As Amended Aug. 20, 1987.

Allan van Gestel with whom Nancer Ballard, William J. Duensing and Goodwin, Procter & Hoar, Boston, Mass., were on brief for defendant, appellant.

Edward J. Shawaker with whom F. Henry Habicht II, Asst. Atty. Gen., Washington, D.C., Robert S. Mueller III, U.S. Atty., Richard E. Welch III, Asst. U.S. Atty., Boston, Mass., and David C. Shilton, Washington, D.C., were on brief for plaintiff, appellee.

Douglas B. MacDonald, Ralph A. Child, David P. Novello and Palmer & Dodge, Boston, Mass., on brief for Sierra Club, amicus curiae.

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and MALETZ,* Senior Judge.

LEVIN H. CAMPBELL, Chief Judge.

This is an appeal by Cumberland Farms of Connecticut, Inc. ("Cumberland") from a judgment of the United States District Court for the District of Massachusetts.[1] The district court ruled that from 1977 to 1985 Cumberland had violated sections 301 and 502 of the Federal Water Pollution Control Act (the "Clean Water Act"), 33 U.S.C. §§ 1311, 1362 (1982), by dredging and filling a freshwater wetland without the required permit from the Army Corps of Engineers ("Corps"). Clean Water Act, section 404, 33 U.S.C. § 1344 (1982). The court ordered injunctive relief directing Cumberland to restore the wetland to approximately its 1977 condition. The court also imposed a civil fine of $540,000, of which $390,000 was to be remitted to Cumberland if it satisfactorily restored the wetland as ordered in the injunction. Cumberland raises numerous issues on appeal.

## I. BACKGROUND

The area in contention consists of about 2,000 acres of the Great Cedar Swamp located in southeastern Massachusetts. Prior to Cumberland's activities, the Great Cedar Swamp was a forested freshwater swamp. It was then one of the largest freshwater wetlands in Massachusetts. Freshwater wetlands are ecologically valuable for various reasons. They act as a natural flood control mechanism by slowing and storing storm water runoff. They help supply fresh water to recharge groundwater supplies. They serve as biological filters by purifying water as it flows through the wetlands. They provide seasonal and year-round habitat for both terrestrial and aquatic wildlife. *See* 33 C.F.R. § 320.4(b) (1986).

In 1972, V.S. Hasiotis, Inc., purchased the 2,000–acre wetland, leasing it to Cumberland Farms of Connecticut, Inc. (a related corporation owned by essentially the same shareholders as Hasiotis, Inc.). Beginning in 1972 and continuing through 1985, Cumberland began converting the swamp into farmland using dredge and fill techniques. Cumberland removed the standing timber, bulldozed the stumps and roots and levelled the soil in preparation for planting. To lower the water table so as to make the wet soil arable, Cumberland dug a network of drainage ditches and channelized two streams (the Raven Brook located on the eastern side of the swamp, and the Bartlett Brook to the west).

In recent times the Army Corps of Engineers has been regulating the dredging and filling of freshwater wetlands, relying for its authority on sections 301 and 502 of the Clean Water Act, 33 U.S.C. §§ 1311 & 1362. These provisions prohibit the discharge of dredged or fill material into "navigable waters" unless authorized by a permit issued by the Corps pursuant to section 404, 33 U.S.C. § 1344. When these provisions were enacted in 1972, the Corps at first construed the term "navigable waters," 33 U.S.C. § 1362(12), literally. Thus from 1972 until 1975, a Corps permit was required under section 404 of the Clean Water Act only if dredge and fill operations took place in waters that were actually navigable.

In 1975, the Corps revised its regulations so that the term "navigable waters" came

---

\* Of the United States Court of International Trade, sitting by designation.

1. The district court's opinion is printed at 647 F.Supp. 1166 (D.Mass.1986).

to include, *inter alia,* freshwater wetlands that were periodically inundated and which supported vegetation that requires saturated soil conditions. *See United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 457, 88 L.Ed.2d 419 (1985); 33 C.F.R. § 209.120(d)(2)(*h*) (1976). In 1977, the Corps further extended its jurisdiction over wetlands by eliminating the requirement that the wetland be periodically inundated, requiring only that it be inundated or saturated by surface or groundwater at a sufficient frequency to support vegetation adapted for life in saturated soils. *Id.* at 458; 33 C.F.R. § 323.2(c) (1978). In *Riverside Bayview Homes,* the Supreme Court upheld the Corps' expanded view of its regulatory authority over freshwater wetlands under the Clean Water Act. *Id.* at 465. In conjunction with its program of regulating dredge and fill activities, the Corps established a number of so-called "nationwide permits." These allow certain categories of activities to be carried on without first obtaining an individual permit. At issue in this case is whether Cumberland's dredge and fill activities were validated by one or another of two nationwide permits.

The practical effect of the Corps' expanding jurisdiction under the Clean Water Act was that, beginning in July 1977, the wetlands in question came under the Corps' regulatory power. Thereafter, Cumberland's dredge and fill activities required an individual permit from the Corps pursuant to section 404, 33 U.S.C. § 1344, unless, as discussed *infra,* Cumberland qualified under a statutory exception to the permit requirement or for a general nationwide permit. Cumberland did not, however, apply for an individual permit in 1977 or thereafter, but continued to dredge and fill in the Great Cedar Swamp. The district court found that from 1978 to 1985 Cumberland converted 674.4 acres of wetland to farmland through the use of dredge and fill. 647 F.Supp. at 1171.

In April 1983, a private individual first alerted the Corps to Cumberland's activities. The Corps then sent a letter to John Peck, Vice President of Operations for Cumberland, noting that discharges of dredge and fill material were apparently being made into waters under the Corps' jurisdiction without the required permit. The letter stated that no additional work should be performed in the area subject to the Corps' jurisdiction unless and until Cumberland obtained a permit. The letter asked for some additional information and recommended that exposed stream banks along the Bartlett and Raven Brooks be stabilized. In addition, the Corps set out eight interim protective measures that Cumberland should institute in order to restore the water table to its 1977 level, including filling various drainage ditches that Cumberland had installed.

In May 1983, Cumberland responded by asserting that its activities fell within the statutory exemption for agricultural work, 33 U.S.C. § 1344(f)(1), and that in Cumberland's view no permit was needed. In June 1983, prior to any further Corps activity, Cumberland instituted an action against the Corps in federal district court seeking a declaratory judgment that its activities were permitted by the statutory agricultural exemption. Cumberland argued that the Corps' letter had been a final determination by the agency of its jurisdiction, and that this determination presented a judicially reviewable issue. Because the Corps allegedly had no power to regulate Cumberland's activities in the Great Cedar Swamp, Cumberland argued that it should not be required to apply for a permit or otherwise go through the administrative process. The district court dismissed Cumberland's action, agreeing with the Corps that, as of yet, the Corps had only made an initial determination of jurisdiction and that this initial determination did not permit judicial review. The court held that to allow the declaratory judgment action to proceed would improperly and prematurely interrupt the Corps' administrative process. The court made it clear that its dismissal of the action would not preclude Cumberland from raising the jurisdictional issue after the Corps had completed its administrative process.

In December 1984, the Corps unequivocally asserted jurisdiction in a letter to

Cumberland. The Corps pointed out alleged violations of the Clean Water Act, ordered that Cumberland cease its illegal activity and demanded that eight interim protective measures be undertaken. These interim protective measures were designed to restore the area to its 1977 freshwater wetland condition. Cumberland objected to the interim protective measures because they would have inundated Cumberland's farm fields. Cumberland refused to implement the protective measures unless and until "some higher authority" determined that to be an appropriate result. For the first time, Cumberland formally applied for an individual permit, but the Corps took the position that under its regulations it could not consider issuance of a retroactive permit until the area had been restored to its 1977 condition under the mandated interim protective measures. 33 C.F.R. § 326.3(c) (1986). The Corps then brought this enforcement action.

The district court held a bifurcated trial with a liability phase and a remedies phase. As to liability, the court found that Cumberland had violated the Clean Water Act by discharging into waters of the United States without a Corps permit. 647 F.Supp. at 1174–75. The court held that Cumberland's activities did not fall within the statutory exemption for agricultural activities, ruling that the exemption applies only to prior established and continuing farming, *id.* at 1175, whereas Cumberland's activities constituted a new conversion of wetland to agriculture. Cumberland does not appeal from this ruling.

The district court also rejected Cumberland's claim that it qualified for either the "headwaters" nationwide permit, 647 F.Supp. at 1177–78, or the "unasserted jurisdiction" nationwide permit, *id.* at 1178–80. Cumberland appeals from these rulings, arguing that both nationwide permits applied to its activities, relieving it from any need to obtain an individual permit.

After finding Cumberland liable for violating the Clean Water Act, the court held a second trial, this time to consider a monetary penalty and an injunction ordering

Cumberland to restore the property to its former state.

The court concluded that it would not assess a fine for the period from 1977 to December 1984. It found the language in the regulation relating to the "unasserted jurisdiction" nationwide permit so opaque as to vitiate any legal culpability on the part of Cumberland during these years. 647 F.Supp. at 1184. *After* December 1984 (when the Corps unambiguously asserted jurisdiction), the court believed that Cumberland could not have misunderstood that the nationwide "unasserted jurisdiction" permit did not cover its activities. The court found that from December 1984 through March 1985, despite the clearly asserted jurisdiction by the Corps, Cumberland continued its further destruction of the Great Cedar Swamp, in direct violation of the Corps' cease and desist order. The court found that this continued intentional violation of the Clean Water Act warranted a civil monetary penalty. 647 F.Supp. at 1185.

The court also considered the Corps' request for an injunction ordering that the wetland be restored to approximately its 1977 condition. The Corps' proposed plan called for a process of restoration with four major components. The water level of the Great Cedar Swamp was to be restored to its 1977 level by filling in certain ditches, and by erecting a series of check dams. The plan proposed that bulldozers be used to create a series of hummocks and hollows so as to best replicate the natural surface topography of a swamp. The plan proposed that narrow strips of vegetation from the nearby existing swamp area be plowed up and moved to the restoration area. These strips of surface vegetation would be spread over the restoration area so as to provide a plant and seed source to regenerate a great variety of swamp species. The plan also proposed that an earthen dam and ditch be constructed along the edge of the restoration area to protect Cumberland's cornfields that were established prior to 1977.

The court generally accepted the Corps' restoration plan, finding that it would con-

fer maximum environmental benefits, 647 F.Supp. at 1181–82, that the plan was practical and would achieve the desired result of restoring the wetland to approximately its 1977 condition, *id.* at 1182–83, and that the restoration bore an equitable relationship to the degree and kind of wrong which it was intended to remedy, *id.* at 1183. The court modified the Corps' proposed restorative plan to the extent of altering the location of the check dams in order to protect nearby cranberry bogs and to better protect Cumberland's cornfields that were to remain. On appeal Cumberland challenges the restoration order, arguing that it is impractical and speculative. Cumberland further argues that the district court should not have ordered restoration of the swamp but rather should have remanded to the Corps so that Cumberland could apply for an after-the-fact individual permit.

## II. NATIONWIDE PERMITS

Cumberland contends that the district court erred in deciding that Cumberland's activities in the Great Cedar Swamp were not authorized under either of two nationwide permits.[2]

### A. *The Headwaters Nationwide Permit*

Cumberland argues that it qualified under the "headwaters" nationwide permit. That permit, codified in 1977 at 33 C.F.R. Part 323, provides,[3]

(a) Discharges of dredged or fill material into the following waters of the United States are hereby permitted for purposes of Section 404, provided the conditions in paragraph (b) below are met:

(1) Non-tidal rivers, streams and their impoundments including adjacent wetlands that are located above the headwaters;

. . . .

(b) For the purposes of Section 404, the following conditions must be satisfied for any discharge of dredged or fill material in waters described in paragraph (a) above:

. . . .

(3) That the fill created by the discharge will be properly maintained to prevent erosion and other non-point sources of pollution. . . .

The term "headwaters" is defined as

the point on a non-tidal stream above which the average annual flow is less than 5 cubic feet per second. The District Engineer may estimate this point from available data using the mean annual area precipitation, area drainage basin maps, and the average runoff coefficient, or by similar means.

33 C.F.R. § 323.2(i) (1977). Thus, so long as specified conditions are met, the headwaters permit authorizes discharges in areas within and adjacent to streams which flow at a rate of less than five cubic feet per second.

In determining that the headwaters permit did not apply to Cumberland's activities, the court below found that the rate of flow of the two streams on Cumberland's property was *greater than* five cubic feet per second. In support of this finding are maps showing that, as early as 1974 or 1975, two streams traversed the length of the property, and evidence that, at the point where each stream left Cumberland's property, the rate of flow exceeded five cubic feet per second (5.6 cubic feet per second on the Raven Brook, and 5.4 cubic feet per second on the Bartlett Brook). Cumberland asserts that at some point on its property the rate of flow for each stream drops below the five cubic feet per second threshold. However, the district

---

**2.** In his answers to the Corps' interrogatories, Mr. Peck, on behalf of Cumberland, stated that Cumberland was not contending that its activities qualified for any nationwide permit. During trial when Cumberland began trying to rely on these nationwide permits, the Corps did not hold Cumberland to its admission in the interrogatory, and so the district court addressed the question of applicability of the nationwide permits. *See* 647 F.Supp. at 1177 n. 7.

**3.** This nationwide permit was subsequently amended and recodified. *See* 33 C.F.R. § 330.5, as modified at 49 Fed.Reg. 39,478, 39,484 (Oct. 5, 1984). The amendments to the permit are not at issue in this case.

court held that Cumberland never met its burden of proof on this point.

Cumberland contends that in cross-examining the Corps' expert, Mr. Manley, it mathematically established how much of its property should be covered by the headwaters permit. But the district court was not persuaded that, without further measurements or expert testimony, this evidence enabled it to pinpoint the location where each stream's flow rate dropped below five cubic feet per second. Manley's own testimony suggested that simple mathematics alone was insufficient to fix that point. He testified that to do so would require study of the topography maps to determine drainage patterns.

█ Since Cumberland is seeking to qualify under this exception to the individual permit requirement, it had the burden of persuading the court of the applicability of the headwaters permit. *See Riverside Irrigation District v. Andrews*, 758 F.2d 508, 514 (10th Cir.1985) (one seeking to qualify under nationwide permit must show that conditions for permit exist). Cumberland did not present any expert testimony to assist the court in applying the mathematical formula, to locate on a map the point where each stream fell below the threshold flow level, and to delineate what wetlands adjacent to that point were covered by the headwaters permit. Cumberland had no right to expect that the unassisted court would or could complete the mathematics, study the drainage patterns, and then apply the formula to a map so as to establish the location of the headwaters and the appropriate adjacent wetlands.

█ The court, moreover, provided an alternative ground for its determination that the headwaters permit did not apply. It found that Cumberland had not complied with the condition of the headwaters permit that the "fill created by the discharge be properly maintained to *prevent erosion* and other non-point sources of pollution."

33 C.F.R. § 323.4–2(b)(3) (1977) (emphasis added).

> It is clear, and the Court so finds, that the drainage ditches erected, despite Cumberland's best efforts, are not so fixed in their banks as to prevent a significant amount of silty erosion from entering the waters discharged.

647 F.Supp. at 1178. Cumberland urges us to construe the Corps' regulation to include only erosion shown to have an adverse or harmful effect on downstream waters. However, when the Corps promulgated the nationwide permit, it said nothing about requiring a showing of a specific adverse or harmful effect from the erosion. *See* 42 Fed.Reg. 37,131, col. 2 (July 19, 1977). Here the court found a "significant" amount of erosion, a finding that does not allow us to treat the erosion as *de minimis*.[4] Under Cumberland's view, it should be free to cause erosion so long as the Corps is unable to trace a downstream effect back to Cumberland as the single property of origin. But this view ignores the possible cumulative harmful effects of erosion from various different properties and sources. Even were erosion from a particular project to be relatively "minor," its combined effect might be deleterious. Moreover, it might be hard to establish its overall contribution to the total harm. Since the headwaters permit is, in effect, an exception to the statutory requirement of an individual permit, we believe the Corps' own, more narrow, interpretation of its regulatory exception should prevail. *See United States v. Huebner*, 752 F.2d 1235, 1241 (7th Cir.) (upholding narrow interpretation of statutory agricultural exemption from permit requirement), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 50 (1985).

B. *The Unasserted Jurisdiction Permit*

█ Cumberland contends that another nationwide permit—the "unasserted jurisdiction" permit—validated its activities.

---

4. The district court found that a "significant" amount of erosion—not merely some "minor" amount as Cumberland claims—was occurring from Cumberland's activities. There was ample evidence, in the form of testimony and pictures, to support the court's finding of "significant" erosion.

The district court held that the unasserted jurisdiction permit does not apply to dredge and fill activities regulated under the Clean Water Act, but rather applies only to activities regulated under the River and Harbor Act. 647 F.Supp. at 1180. Since Cumberland was prosecuted for violating the Clean Water Act, the court found Cumberland's reliance upon the unasserted jurisdiction permit unavailing.

While finding this permit did not apply, the court was troubled that the Corps' 1982 regulations pertaining to the permit were ambiguous—so much so, indeed, that an ordinary person might then have believed, in the court's view, that this nationwide permit *did* validate dredge and fill under the Clean Water Act. Because of the 1982 ambiguity, the district court declined to impose any civil fine for the entire period 1977 through 1984. 647 F.Supp. at 1184. The district court relied on case law invalidating penal sanctions under excessively vague enactments. *Id.* Cumberland argues on appeal that the vagueness of the 1982 regulation should, as well, relieve it from any equitable duty to restore the 2,000–acre property to its 1977 state. To understand this argument—which we find meritless—it is necessary to examine the relevant statutes and regulations in some detail.

Under section 10 of the River and Harbor Act, 33 U.S.C. § 403, the Corps has traditionally protected navigation by regulating the building of structures (piers, docks, etc.) within navigable waters as well as dredge and fill activities in such waters. Any proposed project which would interfere with navigation has required a Corps River and Harbor Act permit. *See* 33 U.S.C. § 403 (creation of any obstruction in navigable waters unlawful absent authorization by Corps).

Starting in 1968, the Corps began to use its authority under the River and Harbor Act to regulate activities within navigable waters which, while not necessarily obstructing navigation, would cause pollution. *See generally Zabel v. Tabb,* 430 F.2d 199 (5th Cir.1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971). Yet while the Corps expanded its use of the River and Harbor Act so as to cover activities causing pollution (as well as those obstructing navigation), it did not (as with the Clean Water Act) claim a right to regulate in waters that were not tidal or navigable in fact. *See* 33 C.F.R. § 322.2(a). Thus today, the Corps administers a dual permit system under two different statutes—the River and Harbor Act and the Clean Water Act—to regulate dredge and fill activities that cause pollution in navigable waters; but in so doing it construes the term "navigable waters" differently. Under section 10 of the River and Harbor Act it construes the term to embrace dredge and fill activities within actually navigable waters, while under section 404 of the Clean Water Act it construes the term so as to regulate dredge and fill in waters that are not only navigable in fact, but may include freshwater wetlands.

In 1977, the Corps' regulations under the River and Harbor Act exempted from the individual permit requirement, "Structures or work completed before 18 December 1968 or in waterbodies over which the District Engineer *has not asserted jurisdiction* provided there is no interference with navigation." 33 C.F.R. § 322.4(g) (1977) (emphasis added). It is this so-called "unasserted jurisdiction" nationwide permit which Cumberland argues obviated any need for it to have obtained in 1977 and thereafter an individual permit under the Clean Water Act.

Cumberland's argument rests on a poorly worded recodification of the unasserted jurisdiction nationwide permit that the Corps issued *in 1982.* This version could be read to imply that the nationwide permit applied to activities regulated under both section 10 of the River and Harbor Act *and* under section 404 of the Clean Water Act. The ambiguous version was in effect only briefly as respects Cumberland, and there is no evidence that anyone from Cumberland ever saw or relied on it, but Cumberland argues that the standard is how it would appear to "men of common intelligence" who had read it. 647 F.Supp. at 1184 (citing *Connally v. General Con-*

*struction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)).

The most obvious weakness in Cumberland's argument is that when, in 1977, its dredge and fill activities first came under the jurisdiction of the Clean Water Act, the Corps' regulations were entirely clear that the unasserted jurisdiction permit applied only to activities regulated under section 10 of the River and Harbor Act. Regulations governing the Clean Water Act were codified at 33 C.F.R. Part 323. In contrast, the regulations governing the Corps permit program under section 10 of the River and Harbor Act were codified at 33 C.F.R. Part 322. In an introductory section, the Corps explained that the regulations under part 322 applied only to section 10 of the River and Harbor Act, noting, however, that certain activities might be governed by more than one statutory or regulatory scheme.

This regulation prescribes, in addition to the general policies of 33 C.F.R. 320.4 and procedures of 33 C.F.R. Part 325 those special policies, practices and procedures to be followed by the Corps of Engineers in connection with the review of applications for Department of Army permits to authorize structures or work in or affecting navigable waters of the United States pursuant to section 10 of the River and Harbor Act of 1899 (33 U.S.C. 403) (hereinafter referred to as section 10). *See* 33 C.F.R. 320.2(b). Certain structures or work in or affecting navigable waters of the United States are also regulated under other authorities of the Department of the Army. These include discharges of dredged or fill material into waters of the United States, including the territorial seas, pursuant to section 404 of the Federal Water Pollution Control Act Amendments of 1972 (33 U.S.C. 1344; *see* 33 C.F.R. Part 323) and ... [listing other statutory Corps authorities not relevant to this issue]. A Department of the Army permit will also be required under these additional authorities if they are applicable to structures or work in or affecting navigable waters of the United States. Applicants for Department of the Army permits under this part should refer to the other cited authorities and implementing regulations for these additional permit requirements to determine whether they also are applicable to their proposed activities.

33 C.F.R. § 322.1 (1977).

The Corps thus made it clear in 1977 and thereafter (until 1982), that the regulations under part 322 applied only to activities regulated under section 10 of the River and Harbor Act, and that applicants should refer to other sections of the regulations, *i.e.*, part 323 which governs the Clean Water Act, to determine whether their proposed activities were regulated under other statutory authorities. In these 1977 regulations, the unasserted jurisdiction permit appeared only in part 322, *see* 33 C.F.R. § 322.4(g) (1977), which governed only section 10 of the River and Harbor Act. No unasserted jurisdiction permit appeared in part 323 which governed the permit program under the Clean Water Act.

Hence in 1977, when Cumberland first should have applied for a Corps permit pursuant to section 404 of the Clean Water Act, the unasserted jurisdiction nationwide permit plainly did not apply to Cumberland's activities since that nationwide permit clearly only applied to activities regulated under the River and Harbor Act.

In 1982, the Corps published interim regulations applicable to the permit programs under both the River and Harbor Act and the Clean Water Act. The revised regulations contained a new subsection, part 330, which codified all the previously promulgated nationwide permits under either statute, as well as some newly proposed permits. The unasserted jurisdiction permit was moved to part 330. *See* 33 C.F.R. § 330.3(b) (1982). An introduction to part 330 stated

The nationwide permits are issued to satisfy the requirements of both § 10 of the River and Harbor Act of 1899 and § 404 of the Clean Water Act *unless otherwise stated.*

33 C.F.R. § 330.1 (emphasis added). The unasserted jurisdiction permit, as recodified at 33 C.F.R. § 330.3 (1982), stated,

The following activities are permitted by a nationwide permit which was issued on 19 July 1977 and need not be further permitted:

. . . .

(b) structures or work completed before 18 December 1968 or in waterbodies over which the District Engineer was not asserting jurisdiction at the time the activities occurred provided, in both instances, there is no interference with navigation.

Thus the recodification of this permit did not expressly state that it applied only to section 10 of the River and Harbor Act. The omission of such a statement leads to Cumberland's present argument that, given the introductory section set out above, the permit applied to activities regulated under both statutes, since the recodified permit does not state otherwise.

The Corps replies that the unasserted jurisdiction permit was simply moved to the new part 330, without any intention that substantive changes be made, and that the permit continued to apply only to section 10 of the River and Harbor Act. In support of its position, the Corps points to language published in the Federal Register when these revised rules were first proposed. *See* 45 Fed.Reg. 62,732 (Sept. 19, 1980). In the preamble to the proposed rules, the Corps stated that it would discuss each of its proposed changes that were significant, but that it would not discuss minor changes such as clarifications, new references or rearrangements. *Id.* The preamble went on to discuss every newly proposed nationwide permit. Also, whenever the scope of an existing nationwide permit was being expanded, the preamble discussed the extent of the expanded permit. For example, the preamble discussed an existing nationwide permit for bank stabilization work which originally applied only section 404 of the Clean Water Act. The preamble explained that the permit was being expanded to cover section 10 River and Harbor Act activities as well. *See* 45 Fed.Reg. 62,735, col. 3 (Sept. 19, 1980). Significantly, the discussion of permits that were being expanded never mentions the unasserted jurisdiction permit. Broadening the applica-bility of the unasserted jurisdiction permit to include a different statute was a major change. Had the Corps intended such a change, it is only reasonable to suppose that it would have discussed it, as it did in the case of the bank stabilization permit. We have little difficulty agreeing with the Corps, therefore, that it did not intend to extend coverage of the existing unasserted jurisdiction permit beyond the River and Harbor Act. Nonetheless, the lower court was undoubtedly right that the 1982 regulations was unclear on this score.

In November 1986, after the district court issued its decision in this case, the Corps expressly clarified its intent by specifying in the final regulations that the unasserted jurisdiction permit only applies to section 10 of the River and Harbor Act. *See* 51 Fed.Reg. 41,206 (Nov. 13, 1986).

Cumberland asserts that it must be allowed to rely upon the unasserted jurisdiction permit because an ordinary person reading the 1982 version of the Corps' regulations would not have known that this permit applied to only section 10 of the River and Harbor Act. Cumberland points to the district court's observation that the Corps' regulation regarding this permit was so "opaque" that it vitiated Cumberland's legal culpability, leading the court, as a matter of discretion, to decline to impose a fine from 1977 to 1984, in which latter year the Corps first made it unequivocally clear that it asserted jurisdiction over Cumberland.

But while the court would not impose a fine for this period—a ruling from which the Corps has not appealed—we are unconvinced that the Corps' drafting errors in its 1982 regulations provides a basis for exempting Cumberland from its equitable duty to undo the consequences of illegal activities commenced in 1977. When in 1977 Cumberland first came under a duty to apply for a section 404 Clean Water Act permit, the Corps' regulations were perfectly clear that the unasserted jurisdiction permit provided no exemption to Cumberland. At the same time, the 1977 regulations unambiguously asserted the Corps' Clean Water Act jurisdiction over freshwa-

ter wetlands such as the Great Cedar Swamp.

It was only in 1982, after Cumberland had ignored and actively violated the Clean Water Act for five years, that the Corps recodified the regulations in such a way that a reasonable person might have thought that the unasserted jurisdiction permit covered Cumberland's work. Two years later, in December 1984, the Corps notified Cumberland that it asserted jurisdiction over the wetlands in question. This ended any exemption that an "unasserted jurisdiction" permit, if applicable, could have provided. Thus while Cumberland's activities from 1977 through 1985 were, absent a permit, plainly illegal, it was only for the brief period from 1982 to 1984 that any claim can be made to the protection of an unasserted jurisdiction permit.[5] We note, moreover, that the district court found that even after Cumberland was on notice, in 1984, that the Corps asserted jurisdiction, making the question of an unasserted jurisdiction permit irrelevant, Cumberland pressed forward in flagrant violation of the Clean Water Act. Given the inequitable behavior on the part of Cumberland and the lack of any evidence of reliance upon, or even knowledge of, the ambiguous regulation, *see* note 2, *supra,* we find that this short period of theoretical doubt cannot be used to excuse Cumberland from its equitable duty to reverse the harmful effects of its illegal activity.

We reject Cumberland's contention that the unasserted jurisdiction permit sheltered its illegal activities in the Great Cedar Swamp so as to relieve it from a duty to restore the property.

## III. THE INJUNCTIVE RESTORATION ORDER

■ Cumberland next asserts that, on principles of equity, the Corps should not be allowed to "retroactively" assert jurisdiction over its farmland, and so Cumber-

land should not have to comply with the injunction ordering the restoration of the Great Cedar Swamp to its 1977 condition. Cumberland asserts that when it began farming the 2,000–acre property, it intended to farm the entire property, and therefore it must be allowed to retain, in farmland, the wetlands it has converted since 1977. Cumberland apparently views the Corps' use of its enforcement authority under the Clean Water Act (albeit eight years after Cumberland's first violation) as an inequitable, retroactive assertion of jurisdiction. Under Cumberland's view, since it got away with these violations for eight years, the Corps is equitably foreclosed from enforcing the Clean Water Act once it finally discovered Cumberland's illegal activities.[6]

There is no principle of equity that supports any such claim, nor do the two cases cited by Cumberland, *United States v. Context-Marks,* 729 F.2d 1294 (11th Cir. 1984), and *Buccaneer Point Estates, Inc. v. United States,* 729 F.2d 1297 (11th Cir. 1984), do so. In each of these cases a landowner began developing property, using dredge and fill, in order to build residential and/or marina facilities. The Corps sent letters to each developer, stating that his activities must cease and that he should obtain a Corps permit because the area being developed was within the Corps' jurisdiction. The developers did no further work on the projects in reliance upon these letters. Subsequently, the Corps determined that the area being developed was *not* in fact covered by the Corps' regulatory authority and that the Corps did not require permits for the developers' activity. Very shortly thereafter, however, the Corps amended its regulations, expanding its jurisdiction to cover the developers' activities. The Corps then demanded that the developers obtain a permit pursuant to section 404 of the Clean Water Act. The Eleventh Circuit held that the two develop-

---

5. According to Cumberland's own representations, it did no dredging and filling at the site between the summer of 1983 and 1985. Since the ambiguous rule was promulgated in July of 1982, only a year's activity at most could have occurred under the purportedly permissive rule.

6. Throughout this enforcement action Cumberland has not asserted, nor has it pointed to, any statute of limitations which might preclude enforcement of the Clean Water Act.

ers would not be required to get a permit because the evidence showed that if the Corps had not erroneously asserted jurisdiction, and if the developers had not ceased their activities in response to the Corps' erroneous cease and desist order, the two projects would have been completed *prior to* the promulgation of the Corps' new regulations which expanded jurisdiction.

These two cases are altogether different from the present. There, the developers would have completed their projects, for which permits were not then required, had the Corps not *erroneously* asserted jurisdiction. It was arguably inequitable to allow the Corps to utilize its subsequently enhanced jurisdiction to burden the stalled projects.

Such, however, is not the case with respect to Cumberland's activities in the Great Cedar Swamp. The Corps is not relying on a retroactive assertion of jurisdiction. The Corps had jurisdiction from 1977 on, its jurisdiction having been enlarged to cover freshwater wetlands. Cumberland was accordingly required by law in 1977 and thereafter to obtain a Clean Water Act permit. Cumberland never obtained a permit but continued its dredge and fill activities in violation of law. The Corps is not retroactively asserting jurisdiction, but rather is properly seeking enforcement of the Clean Water Act from the date that Cumberland first violated the act. Cumberland points to no evidence that it would have converted the full 2,000 acres prior to 1977, and that the Corps' actions somehow delayed implementation of that timetable.

There is no merit in Cumberland's assertion that simply because it planned, in 1972, eventually to convert the entire 2,000 acres of wetland to farmland, that it should be excused from complying with the permit requirements of the Clean Water Act which

became applicable to Cumberland's property in 1977. Cumberland was then required by law to apply for and obtain a permit but never did so. Cumberland's unarticulated future intentions for the property cannot be used to preclude the application of the federal law.

Cumberland further contends that the court should not have delved into the details of a restorative order, but should have simply issued an order to prevent further work and remanded the matter to the Corps for further administrative proceedings through an after-the-fact permit application. Processing such an after-the-fact permit would require an administrative hearing which would ensure public participation. Cumberland argues that the Corps' regulations evince a clear agency policy that the program of regulating wetlands should consider the full public interest by balancing the favorable and detrimental impacts of a proposed activity. *See* 33 C.F.R. § 320.1(a). Cumberland asserts that such a balancing of public interests can be best accomplished through an after-the-fact permit process.

The regulations that Cumberland points to as evincing a policy of public participation through an administrative hearing are primarily concerned with permit applications for *proposed* projects that will occur in wetlands.[7] The present circumstances do not easily fit within the frame of a proposal stage proceeding. In the latter, there is more time to solicit public input and to weigh competing values before authorization of the proposed project. Here, there was a serious, ongoing violation of the Clean Water Act, as to which the Corps' regulations, found at part 326, "Enforcement, Supervision and Inspection," are more on point. Under part 326, the regulations make it clear that the Corps will consider an after-the-fact permit only if the violator has completed interim remedial

---

7. While primarily designed for proposed projects, these same regulations do apply to an after-the-fact permit process. However, as the regulations make clear, *see infra,* the Corps considers such after-the-fact applications only after any environmental damage has been ameliorated through implementation of necessary interim protective measures. Thus, for those after-the-fact applications where the violator has protected against further environmental damage, the Corps can take the time to convene hearings to consider the public's views. Such is not the case here. *See infra.*

work which the Corps deems necessary to protect public resources. In the present case, Cumberland refused to comply with the Corps' interim remedial order, which was designed to restore the area to its 1977 wetland condition, "unless and until some higher authority determines that to be an appropriate result." Therefore, the Corps refused to consider an after-the-fact permit for Cumberland's activities.

The Corps' enforcement regulations' subsection entitled "Administrative action" states,

*Remedial work.* (1) The district engineer shall determine whether as a result of the unauthorized activity, life, property or important public resources are in serious jeopardy and would require expeditious measures for protection. Such measures may range from minor modification of the existing work to complete restoration of the area involved.... If the district engineer determines that immediate remedial work is required, he shall issue an appropriate order describing the work, conditions and time limits required to provide satisfactory protection of the resource.

33 C.F.R. § 326.3(b). Thus the district engineer is expected to issue such remedial orders as he deems necessary, and such orders may range, as necessary, from minor modifications to complete restoration of the wetland, which was the case here.

Under the subsection entitled "Acceptance of an after-the-fact application," 33 C.F.R. § 326.4(c), the regulations clearly require that remedial work be completed before the Corps will accept an after-the-fact permit application.

Upon completion of appropriate remedial work, if any, the district engineer shall accept an application for an after-the-fact permit for all unauthorized activities unless:

(1) Civil action to enforce an order issued pursuant to § 326.2 or § 326.3(b) [remedial orders] is required....

The regulations also clearly set out the Corps' enforcement policy that in exceptional circumstances, *i.e.*, knowing, flagrant, repeated or substantial impact violations of the Clean Water Act, the Corps shall seek civil penalties, as was done in this case. The regulations state that the district engineer may recommend to the United States Attorney that a complaint seeking such civil penalties be filed and that "[a]n after-the-fact application should not be accepted until the enforcement action is completely resolved." 33 C.F.R. § 326.4(c)(4).

Thus, contrary to Cumberland's assertions, the Corps was acting well within its enforcement policies as articulated in its regulations. When Cumberland refused to comply with the Corps' remedial order, and instead continued further destruction of the wetland, the Corps was within its rights, and indeed was left with no other recourse, but to seek judicial enforcement of the remedial restoration order, rather than to process administratively an after-the-fact permit.

Cumberland's reliance upon the primary jurisdiction doctrine is similarly misplaced. The doctrine of primary jurisdiction helps to define the relationship between courts and administrative agencies by recognizing that if an agency adjudicatory proceeding is ongoing, courts will usually not interfere until the administrative process is complete. By suspending the judicial process, appropriate issues can be referred to the agency for its special expertise, and courts will not prematurely interfere with the administrative process. *See United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). As discussed above, however, under the Corps' regulations no further administrative proceedings are pending, nor can the Corps entertain any further permit proceeding until Cumberland complies with the interim orders, which Cumberland refused to do. Thus the district court was not impermissibly interfering with the Corps' administrative process. Rather it was the Corps itself which sought the aid of the district court after Cumberland had ignored the Corps' cease and desist order and had refused to implement the protective measures. Moreover, in fashioning the remedy, the court had the full benefit

of the Corps' expertise through the Corps' proposed restoration plan, which the court adopted with only a few changes.

Cumberland presents no authority for the proposition that the district court lacked authority to issue a restoration order. The Clean Water Act authorizes the commencement of a civil action "for appropriate relief, including a permanent or temporary injunction." 33 U.S.C. § 1319(b) (1983). We believe that the district court had authority to issue such restorative orders so as to effectuate the stated goals of the Clean Water Act "to maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251 (1983). See Weinburger v. Romero-Barcelo, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (under section 1319 of Clean Water Act, district court not required to order injunctive relief but is permitted to exercise equitable discretion to order relief that will achieve compliance with the act). In United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960), the Supreme Court held that under section 10 of the River and Harbor Act, district courts had the authority to issue injunctive restoration orders despite the lack of explicit statutory authority to do so.

> Congress has legislated and made its purpose clear; it has provided enough federal law in section 10 from which appropriate remedies may be fashioned even though they rest on inferences. Otherwise we impute to Congress a futility inconsistent with the great design of this legislation.

Id. at 492, 80 S.Ct. at 890.

Cumberland further attacks the substance of the restoration order, arguing that it is speculative and untested, will cause harm to third parties and is inequitable. The district court issued an injunctive order that the converted area be restored to its 1977 condition after finding that the restoration order (1) would confer maximum environmental benefits; (2) was achievable as a practical matter; and, (3) bore an equitable relationship to the degree and kind of wrong that it is intended to remedy.[8] See United States v. Sexton Cove Estates, 526 F.2d 1293, 1301 (5th Cir. 1976); United States v. Weisman, 489 F.Supp. 1331, 1343 (M.D.Fla.1980).

■ We review an award of injunctive relief only for an abuse of discretion. See Lemon v. Kurtzman, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973); Pino v. Protection Maritime Insurance Co., 599 F.2d 10, 16 (1st Cir.), cert. denied, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979). Any findings of fact, upon which the court's exercise of discretion is based, will stand unless clearly erroneous. See Fortin v. Commissioner of Massachusetts Department of Public Works, 692 F.2d 790, 794 (1st Cir.1982). We find no abuse of discretion here.

■ The district court carefully considered the possible detrimental impact of the proposed order, but found that the beneficial aspects of the restoration order outweighed the possible detrimental aspects. The court found that restoration of the site to its 1977 status would assist in flood control; would significantly improve the functioning of the area as a biological filter; and would have a direct improvement on wildlife habitat. The court found that the restoration was in the public and national interest and would maximize environmental benefits.

The district court further found that the restoration order proposed by the Corps was "technically competent and innovative." 647 F.Supp. at 1183. Cumberland's contention that the district court abused its discretion by ordering a "speculative" plan is unfounded. The court was presented with testimonial evidence that the first two facets of the plan, reestablishing the wetland topography of hollows and hummocks, and raising the water table to 1977 levels

---

**8.** The government did not object to the district court's use of this three part test for determining the appropriateness of a restoration order. On appeal, the government urges that a less demanding test is appropriate. However, the government's acquiescence on this point before the district court forecloses the issue here, and we shall not address it. See Johnston v. Holiday Inns, Inc., 595 F.2d 890, 894 (1st Cir.1979).

were necessary in order to restore the wetland. The third step of spreading strips of vegetation, taken from a nearby swamp so as to provide for the regeneration of diverse species is, as the court found, innovative. However, it is not so speculative as to taint the injunctive order. The Corps presented testimony by an ecologist who had been involved in a great number of wetland restoration projects, some of which used the technique of borrowing plant material from nearby wetlands to be used as a plant source. He testified concerning the successes reached in these prior restoration projects. The ecologist testified that he thought the restoration plan in this case was achievable as a practical matter, and was an "average plan in terms of the degree of difficulty" as compared with other restoration plans he had worked on. While none of the prior successful restorations dealt with exactly the same situation, clearly the court had enough evidence before it to evaluate the practicality of this "innovative" approach.

Cumberland asserts that it would be inequitable to enforce the order because, according to Cumberland, it will have a detrimental effect on the nearby cranberry bogs and on five houses that were built near the wetland after it was drained and converted to farmland. The court was well aware of these potential problems, and adequately protected those interests. The Corps presented testimony concerning the potential detrimental impacts on the cranberry bogs. The court modified the Corps' proposed plan, altering the locations of proposed "check dams," in order to better protect the nearby cranberry growers.

As to the nearby houses, the court was sensitive to possible adverse effects, but felt the balance should be struck in favor of enforcing the Clean Water Act which had been violated since 1977. We note that through testimony and an elevation survey, the Corps presented evidence that the possibility of detrimental effects on the houses from the raised water table is minimal.[9]

Finally, Cumberland asserts that it is inequitable to enforce the restoration plan because it will have the effect of inundating its valuable farm fields. The district court was careful to protect any fields Cumberland had converted prior to 1977, modifying the proposed plan to better protect those fields. To be sure, in the area converted since 1977, the restoration order places a heavy burden on Cumberland. However, Cumberland has no one but itself to blame for that burden.

Had Cumberland complied with the Clean Water Act when the Act first became applicable to its activities in 1977, no such burdensome order reversing the many years of illegal activity would have been necessary. Moreover, Cumberland's intentional, unlawful conversion activities continued even after the Corps actively tried to get Cumberland's cooperation in complying with the law. We believe the district court did not err in finding that the restoration order bore an equitable relationship to the degree and kind of wrong which it is intended to remedy.

*Affirmed.*

---

9. The Corps submitted, as part of its memorandum in support of the restoration order, a survey of elevations of the recently built houses, to which Cumberland did not object. The survey showed that the lowest base elevation of the houses was 41.89 NGVD (National Geodetic Vertical Datum, essentially the elevation above designated sea level). Testimony by one of Cumberland's witnesses was that the cellars of these houses would extend seven feet below ground, *i.e.,* at approximately 34 feet of elevation, and that septics would extend six feet below the surface, *i.e.,* approximately 35 feet of elevation. Testimony at trial showed that the water table on Cumberland's land would be raised, by filling in ditches and constructing check dams, to approximately 26 to 28 feet, or perhaps during flood stages to 30 feet of elevation.