

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-22-1994

# United States v. Brace

Precedential or Non-Precedential:

Docket 94-3076

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"United States v. Brace" (1994). *1994 Decisions.* Paper 198.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/198

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————————

No. 94-3076

—————————

UNITED STATES OF AMERICA,

Appellant

v.

ROBERT BRACE;
ROBERT BRACE FARMS,
a Pennsylvania Corporation

—————————

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 90-cv-00229E)

—————————

Argued September 19, 1994

Before:  BECKER and COWEN, Circuit Judges
and POLLAK*, District Judge

(Filed:  November 22, 1994)

—————————

Bonnie R. Schlueter
Office of United States Attorney
633 United States Post Office & Courthouse
Pittsburgh, PA 15219

William B. Lazarus (argued)
United States Department of Justice
P.O. Box 23795
L'Enfant Plaza Station
Washington, DC 20026

          COUNSEL FOR APPELLANT
          UNITED STATES OF AMERICA

*Honorable Louis H. Pollak, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.


Samuel W. Braver
Henry McC. Ingram (argued)
Buchanan Ingersoll Professional Corporation
600 Grant Street
58th Floor
Pittsburgh, PA 15219

John D. Ward
Buchanan Ingersoll
30 North Third Street
Vartan Parc, 8th Floor
Harrisburg, PA 17101-2023

       COUNSEL FOR APPELLEES
       ROBERT BRACE;
       ROBERT BRACE FARMS,
       a Pennsylvania Corporation

---

**OPINION OF THE COURT**

---

COWEN, <u>Circuit</u> <u>Judge</u>.

The United States brought this action in the United States District Court for the Western District of Pennsylvania against Robert Brace, individually, and Robert Brace Farms, Inc., a Pennsylvania corporation (collectively, "Brace" or "defendants"), alleging violations of the requirement in Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, that a permit be obtained for the discharge of dredged or fill material into waters of the United States. The United States sought restoration of the site, a permanent injunction and civil penalties pursuant to 33 U.S.C. § 1319(d).

The district court bifurcated the action: a trial on liability issues and a trial on remedy issues. Shortly before the liability trial, Brace stipulated that at the time of the discharges, "the approximately thirty-acre site that is the subject of this lawsuit was wetlands as defined at 33 C.F.R. § 328.3(b) and 40 C.F.R. § 232.2(r)." Pre-Trial Stipulation (Dec. 16, 1993); Appendix ("App.") at 40.

The United States, either by stipulation or at trial, established the five elements of a prima facie case for violations of Section 404 of the CWA: (1) defendants admitted that they are "persons" within the meaning of the CWA; (2) defendants admitted that the activities at the site were conducted without a permit; (3) defendants stipulated that the site was a wetland at the time of the discharges; (4) the district court held that the site constituted waters of the United States at the time of defendants' activities; and (5) the district court held that defendant's clearing, mulching, churning, and levelling of the formerly wooded and vegetated site constituted a discharge of pollutants into the waters of the United States and that defendants paid for excavation and installation of drainage tubing in an effort to drain the site.

Brace asserted, and the district court held, that the discharges were exempt from the permit requirement under Section 404(f)(1). The court concluded that: (1) Brace's activities on the wetland constituted "normal farming activities" exempt under Section 404(f)(1)(A); and (2) Brace's activities constituted "upland soil and water conservation practices" also exempt under

that same provision of the CWA.  United States v. Brace, C.A. No. 90-229 (W.D. Pa. Dec. 16, 1993), slip op. at 22-23.  In addition, the court found that Brace's conduct in "preserving and regularly cleaning the existing drainage system on the site" was exempt from the permit requirement as "maintenance of the drainage system" under Section 404(f)(1)(C).  Id. at 23.  The court also held that the recapture provision of Section 404(f)(2) does not apply to this case because "[t]he land is not being converted to a use to which it was not previously subject, nor has significant impairment to the reach or flow of waters been proven."  Id. at 22.

The district court entered judgment in defendants' favor. We hold that the district court incorrectly applied the requirements of the CWA permit exemption provisions.  We will reverse the order of the district court and remand the case to determine the appropriate remedy.


I.


Brace is a farmer who owns approximately 600 acres of real property in Erie County, Pennsylvania, including the subject thirty-acre wetland site ("the site").  Brace Farms, Inc. is a Pennsylvania corporation engaged principally in the farming business.  Brace's parents and other family members have always earned their principal livelihood from farming activities.  Brace purchased a parcel of farm property from his father in 1975.  A portion of that property contains the site.  The property has

been in the Brace family since the 1930's when Brace's grandfather farmed the land.  Prior to 1975, Brace's father used the site for pasturing of cows and horses, and Brace's brother used the site for pasturing cows until 1976.

Brace purchased the property from his father with the intent of continuing and improving his father's established farming operation.  It was Brace's intention to integrate the various portions of the property into an overall operation for an effective and productive farming business.  At the time Brace purchased the property containing the site from his father, the site was vegetated with areas of scrub brush, including red brush and briars.

In 1977, Brace sought the advice and assistance of the Agricultural Stabilization and Conservation Service ("ASCS") as part of his plan to develop an integrated farming operation on the property that includes the site.  The ASCS is "an agency of the United States Department of Agriculture which is generally responsible for administering commodity production adjustment and certain conservation programs of the Department."  7 C.F.R. § 12.2(a)(2) (1994).  Brace's father had previously worked with the ASCS to prepare a drainage plan relating to the site for the purpose of farming the entire property.  At the time he purchased the property from his father, Brace obtained and utilized the soil and conservation plans that had been prepared for his father by the ASCS.  The drainage system impacts the ability to produce crops on all parts of Brace's property.

The existing drainage system was in poor condition and not yet complete at the time of Brace's acquisition. Brace began cleaning the system in 1976 in order to improve upon the existing system and make it effective for agricultural development. In the following years, Brace maintained and improved the drainage system pursuant to the plan recommended by the ASCS. From 1977 to 1985 the ASCS periodically visited the site and provided technical assistance and cost-sharing arrangements to Brace.

As of 1977, the essential portions of Brace's improvements to the existing drainage system were intact and operating. Brace's work in improving upon the interconnected drainage system progressed continuously from 1977 to 1987, as time, funds and equipment were available. If the necessary funds had been available to him in 1977, Brace would have expedited his farming plans and completed the project at that time. As a result of Brace's efforts, by the end of 1979 the site was dry, with the exception of times of excessive rainfall.

Brace cleared, mulched, churned, levelled, and drained the formerly wooded and vegetated site from 1985 through 1987. In 1986 and 1987, Brace paid for excavation in the site and the burying of plastic tubing or "drainage tile" in an effort to drain the site. Throughout the 1980's, Brace used appropriate equipment to remove unconsolidated soil, pebbles, silt, and growth which were impeding water flow. Farmers in the area typically engaged in such practices.

As a result of Brace's levelling, spreading, and tiling, Brace began to grow crops on the site in 1986 and 1987. Brace

did not have a permit issued pursuant to Section 404 of the CWA authorizing his activities.

The United States became aware of Brace's activities in 1987. During 1987 and 1988, the United States issued three orders to Brace, directing him, inter alia, to refrain from further disturbing the site, so that it could naturally revegetate with indigenous plant species. After the issuance of these orders, Brace continued to mow vegetation on the site. In October of 1988, Brace received an administrative complaint in connection with his farming activities on the site. Brace requested a hearing to contest the complaint, believing that his activities were exempt from any and all permit requirements. Prior to the hearing, the complaint was dismissed.

In the summer of 1988, Brace approached the ASCS in order to gain the status of "commenced conversion from wetlands" prior to December 23, 1985 with respect to the site. The ASCS was authorized to make such a determination under the Food Security Act of 1985, 16 U.S.C. §§ 3801, et seq. This Act contains a provision, referred to as the "Swampbuster," which denies certain Department of Agriculture benefits to farmers who produce an "agricultural commodity on converted wetland," unless such conversion commenced before December 23, 1985. 16 U.S.C. §§ 3821, 3822 (1988 & Supp. V 1993).

The ASCS granted the status to the site, finding that Brace's on-going farming activities had commenced prior to December of 1985, which would enable Brace to complete conversion and produce an agricultural commodity without losing USDA

benefits.  Letter from Erie County ASCS Office to Robert Brace (9/21/88); App. at 172.  However, the ASCS expressly noted that "[t]he granting of a commencement . . . request does not remove other legal requirements that may be required under State or Federal water laws."  USDA Form; App. at 173.

In April 1990, as a cautionary measure, Brace approached the Army Corps of Engineers ("COE") in an effort to obtain an after-the-fact permit to conduct his farming activities on the site, despite his belief that the activities were exempt from the permit requirements of the CWA.  The United States Environmental Protection Agency ("EPA") requested that the COE not review an application from Brace for an after-the-fact permit.  Brace was advised that because the matter was then in litigation, the government would not act on his request for a permit.  Since the time of the cease and desist orders Brace has terminated farming activity on the site except for routinely mowing the vegetation.

## II.

The district court exercised its jurisdiction pursuant to 33 U.S.C. § 1319(b) (1988) and 28 U.S.C. §§ 1331, 1345, 1355 (1988 & Supp. V 1993).  Our jurisdiction rests on 28 U.S.C. § 1291 (1988).

Presently, there are three issues before us.  The first issue is whether the district court erred in determining that Brace's discharges of dredged and fill material into the wetland were exempt from the permit requirement pursuant to Section

404(f)(1) of the CWA, 33 U.S.C. § 1344(f)(1). The second issue is whether the district court erred in determining that Brace's discharges were not "recaptured" by the permit requirement under Section 404(f)(2) of the CWA, 33 U.S.C. § 1344(f)(2). We have plenary review over the question of whether the district court erroneously interpreted the meaning of the applicable statutes. Moody v. Sec. Pac. Business Credit, Inc., 971 F.2d 1056, 1063 (3d Cir. 1992); Manor Care, Inc. v. Yaskin, 950 F.2d 122, 124 (3d Cir. 1991). To the extent that the court's ruling on these issues was also premised on findings of fact, we review any such findings under the clearly erroneous standard. Zenith Radio Corp. v. Hazeltime Research, Inc., 395 U.S. 100, 108, 89 S. Ct. 1562, 1568 (1969); Sheet Metal Workers Int'l Ass'n Local 19 v. 2300 Group, Inc., 949 F.2d 1274, 1278 (3d Cir. 1991).

The third issue is whether the district court erred in determining that Brace was not subject to liability for violations of administrative orders. Our review of questions of law such as this is plenary. Moody, 971 F.2d at 1063; Manor Care, 950 F.2d at 124.

III.

The Clean Water Act was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (1988). Section 301(a) of the CWA prohibits the discharge of any pollutant into navigable waters of the United States, unless the discharge is authorized by a

permit. 33 U.S.C. §§ 1311(a), 1362(12) (1988). We recognize that:

> The Act defines the operative terms of this prohibition broadly. The term "pollutants" includes fill material such as "dredged spoil, . . . rock, sand, [and] cellar dirt," 33 U.S.C. § 1362(6), and "navigable waters" means "the waters of the United States," id. § 1362(7). In so defining the term "navigable waters," Congress expressed a clear intent "to repudiate limits that had been placed on federal regulations by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed `navigable' under the classical understanding of the term."

United States v. Pozsgai, 999 F.2d 719, 724 (3d Cir. 1993), cert. denied, __ U.S. __, 114 S. Ct. 1052 (1994) (citations omitted). The district court found that Brace's clearing, churning, mulching, levelling, grading, and landclearing of the formerly wooded and vegetated site was a discharge of a dredged spoil, biological material, rock and/or sand, each of which fits the definition of pollutant. Brace, slip op. at 18.

Section 404 of the CWA authorizes the Secretary of the Army, through the COE, to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a) (1988). See also 33 C.F.R. § 323.1 (1993). The permit program, as we recognized in Pozsgai, "is the central enforcement tool of the Clean Water Act . . . . Unpermitted discharge is the archetypical Clean Water Act violation, and subjects the discharger to strict liability." 999 F.2d at 724-25.

The COE and EPA have issued regulations defining the term "waters of the United States" to include "wetlands," among other bodies of water:

(a)  The term <u>waters of the United States</u> means

(1)  All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; . . .

(3)  All other waters such as intrastate lakes, rivers, streams (including intermittent streams), . . . wetlands, . . . the use, degradation or destruction of which could effect interstate or foreign commerce . . .

(5)  Tributaries of waters identified in paragraphs (a)(1) through (4) of this section . . .

(7)  Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1) through (6) of this section.

33 C.F.R. § 328.3(a) (1993); 40 C.F.R. § 230.3(s) (1993) (emphasis in original).  The district court found that the site constituted waters of the United States at the time of Brace's activities.  <u>Brace</u>, slip op. at 17.  The term "wetlands" is defined as:

those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.  Wetlands generally include swamps, marshes, bogs, and similar areas.

33 C.F.R. § 328.3(b); 40 C.F.R. § 230.3(t).  The parties have stipulated that the site constituted wetlands at the time of Brace's activities.

Exemptions to the general requirement for a Section 404 permit are contained in Section 404(f) of the CWA. Under Section 404(f)(1), a permit is not required for: (1) the discharge of dredged or fill material "from normal farming, silviculture, and ranching activities such a plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices," 33 U.S.C. § 1344(f)(1)(A); and (2) the discharge of dredged or fill material "for the purpose of . . . the maintenance of drainage ditches." 33 U.S.C. § 1344(f)(1)(C).

The COE and EPA have promulgated regulations which provide that the "normal farming activities" exemption is available only to discharge activities that are "part of an established (i.e., on-going) farming . . . operation," and expressly stipulate that the exemption is not available either: (1) for "[a]ctivities which bring an area into farming . . . use"; or (2) where "modifications to the hydrological regime are necessary to resume operations." 33 C.F.R. § 323.4(a)(1)(ii) (1993); 40 C.F.R. § 232.3(c)(1)(ii)(A), (B) (1993).

This provision further requires that, to be exempt from the permit requirement, such activities "must be in accordance with definitions in 33 C.F.R. § 323.4(a)(1)(iii)." 33 C.F.R. § 323.4(a)(1)(ii). The definitions in 33 C.F.R. § 323.4(a)(1)(iii) provide that "the redistribution of surface materials by blading, grading, or other means to fill in wetland areas is not plowing." 33 C.F.R. § 323.4(a)(1)(iii)(D); 40 C.F.R. § 232.3(d)(4). The definitions also define "minor drainage" as meaning "[t]he

discharge of dredged or fill material incidental to connecting upland drainage facilities to waters of the United States, adequate to effect the removal of excess soil moisture from upland croplands." 33 C.F.R. § 323.4(a)(1)(C)(1)(i); 40 C.F.R. § 232.3(d)(3)(i)(A). This latter definition is modified by 33 C.F.R. § 323.4(a)(1)(iii)(C)(2) and 40 C.F.R. § 232.3(d)(3)(ii), which further provide that the term minor drainage "does not include drainage associated with the immediate or gradual conversion of a wetland to a non-wetland . . . , or conversion from one wetland use to another."

The COE has also promulgated definitions concerning the second exemption to the permit requirement, i.e. the exemption for the maintenance of drainage ditches. The definitions provide that the exemption from the permit requirement applies to "maintenance (but not construction) of drainage ditches." 33 C.F.R. § 323.4(a)(3).

Even where Section 404(f)(1) exempts a discharge from the permit requirement, the discharge may be "recaptured" by the permit requirement under Section 404(f)(2):

     Any discharge of dredged or fill material into the
     navigable waters incidental to any activity having as
     its purpose bringing an area of the navigable waters
     into a use to which it was not previously subject,
     where the flow or circulation of navigable waters may
     be impaired or the reach of such waters be reduced,
     shall be required to have a permit under this section.


33 U.S.C. § 1344(f)(2). The regulation governing the "recapture" provision stipulates in part that "[a] conversion of a section 404 wetland to a non-wetland is a change in use of an area of

waters of the United States," 33 C.F.R. § 323.4(c), and states as an example, that "a permit will be required for the conversion of a cypress swamp to some other use . . . when there is a discharge of dredged or fill material into waters of the United Stated in conjunction with construction of . . . structures used to effect such conversion." Id.

Thus, to be exempt from the CWA permit requirement, a defendant has the burden of demonstrating that proposed activities both satisfy the requirements of Section 404(f)(1) and avoid the recapture provision of Section 404(f)(2). United States v. Akers, 785 F.2d 814, 819 (9th Cir.), cert. denied, 479 U.S. 828, 107 S. Ct. 107 (1986). See also United States v. Cumberland Farms, 647 F. Supp. 1166, 1176 (D. Mass. 1986) ("[E]ven if [defendant] could establish that it is exempt from the permit requirements under § 1344(f)(1), it must also demonstrate that its activities avoid `recapture' under the provisions of 33 U.S.C. § 1344(f)(2)."), aff'd, 826 F.2d 1151 (1st Cir. 1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1016 (1988). Read together, the two parts of Section 404(f) provide a narrow exemption for agricultural activities that have little or no adverse effect on the waters of the United States. Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897, 926 (5th Cir. 1983). Congress intended this narrow exemption. As Senator Muskie, one of the primary sponsors of the CWA, explained:
> New subsection 404(f) provides that Federal permits will not be required for those narrowly defined activities that cause little or no adverse effects either individually or cumulatively. While it is understood that some of these activities may

necessarily result in incidental filling and minor harm to aquatic resources, the exemptions do not apply to discharges that convert extensive areas of water into dry land or impede circulation or reduce the reach or size of the water body.

3 A Legislative History of the Clean Water Act of 1977: A Continuation of the Legislative History of the Water Pollution Control Act, at 474 (1978).

IV.

The district court held that Brace's activities on the thirty-acre wetland site were exempt from Section 404's permit requirement "because they constitute: (a) normal farming activities; (b) upland soil and water conservation practices; and (c) maintenance of drainage ditches." Brace, slip op. at 22. We find that the district court's determination is erroneous as a matter of law.

The district court's conclusion that Brace's discharges on the thirty-acre site constituted "normal farming activities" which are exempt from Section 404's permit requirement cannot be reconciled with the statute, the applicable regulations, and case law governing the "normal farming activities" exemption. As we described above, Section 404(f) of the CWA provides exemptions to the general permit requirement, including the discharge of dredged or fill material without a permit in connection with "normal farming . . . activities such as plowing, seeding, cultivating, minor drainage, harvesting . . . or upland soil and

water conservation practices."  33 U.S.C. § 1344(f)(1)(A).  In determining that Brace's activities fell within this provision, the district court relied on facts that are irrelevant to the inquiry required by the applicable law.  The district court appears to have based its conclusion on a casual observation that what Brace did was "normal" activity for a farmer in Erie County, rather than on the application of the regulatory construction accorded the statutory term "normal farming activities" by the agencies charged with the implementation of the statute.[1]

The applicable regulation provides that, to constitute "normal farming activity" within the meaning of the statute, the activity:

> must be part of an established (i.e., on-going) farming
> . . . operation and must be in accordance with the
> definitions in § 323.4(a)(1)(iii) . . . .  Activities
> which bring an area into farming . . . use are not part
> of an established operation.  An operation ceases to be
> established when the area on which it was conducted has
> been converted to another use or has lain idle so long
> that modifications to the hydrological regime are
> necessary to resume operations.

33 C.F.R. § 323.4(a)(1)(ii).  Brace's activities between 1985 and 1987 meet neither prong of this provision:  they were neither part of an "established (i.e., on-going) farming operation," nor were they conducted "in accordance with the definitions in § 323.4(a)(1)(iii)."

A.

---

[1].  See 33 U.S.C. §§ 1251(d) and 1344 for the implementation authority of the EPA and COE.

Brace points out that in determining whether farming activities are established and continuing, the conduct must be analyzed by a contextual review of the total activities. Cumberland Farms, 647 F. Supp. at 1175. He argues that the district court correctly undertook a contextual analysis in its determination that the site was an integral part of an established and on-going farm operation, and Brace's activities between 1985 and 1987 did not bring a new area into the operation. Brace, slip op. at 12. The district court based its conclusion on: (1) its determination that the site is an integral part of the drainage system previously installed in adjoining crop producing fields; (2) its finding that the installation of a drainage system at the site "is normal farming activity in order to make land suitable for farming," because "[e]xtensive underground drainage systems are typical and necessary aspects of farming in Erie County," id. at 3; and (3) the ASCS determination that Brace had "commenced conversion" of the site from wetland to cropland prior to December 23, 1985.

The district court's reasoning and conclusion are improper. The district court misinterpreted the meaning of the "established farming operation" requirement. The district court believed it was appropriate to examine the relationship of the site in question to the rest of the land owned by the same property-owner in determining whether land was being brought into farming use. Brace maintains that it is arbitrary to delineate artificially a portion of the farm and without rational justification sever it

from his overall operations. We cannot agree with this interpretation of the statute's requirement.

The regulations provide that, "[a]ctivities which bring an area into farming . . . use are not part of an established operation." 33 C.F.R. § 323.4(a)(1)(ii); 40 C.F.R. § 232.3(c)(1)(ii)(B) (emphasis added). The regulations do not specify the precise area to which we should look in determining whether there is an established farming operation. There are no minimum limits placed on the "area" being brought into farming use. Thus, we read the regulations to provide that an exemption is available only to activities that are part of an "established farming operation" at the site. A proper "contextual review of its total activities" only requires us to analyze whether such activities are "established and continuing" on the thirty-acre wetland site itself. See Cumberland Farms, 647 F. Supp. at 1175 (referring to "the site," rather than the property owner's total land holdings).[2] Our reading of the regulation recognizes the statute's legislative history and is in accord with the strict construction of the permit exemptions afforded by other Courts of Appeals. See, e.g., Akers, 785 F.2d at 819, 823; United States v. Huebner, 752 F.2d 1235, 1240-41 (7th Cir.), cert. denied, 474 U.S. 817, 106 S. Ct. 62 (1985); Marsh, 715 F.2d at 925 n.44.

---

[2]. We recognize that the designation of the use of some very small sites will be effectively inseparable from the use of the surrounding land for established farming operations. Thus, we would not require that every square foot be used for farming in order for a site to meet the established operation exemption. In this case, however, it is clearly reasonable to require that all or substantially all of the thirty-acre site be part of an established operation.

Brace himself testified that: (1) for the nine-year period prior to the discharges onto the site, from 1977 to 1986, his activities at the site included no pasturing or growing of any crops, but consisted entirely of efforts to drain the wetland; (2) the site was fully covered in 1983 with indigenous plants, but that all plants had been stripped from the site in 1987, subsequent to the discharge activities; and (3) the purpose of his 1985-1987 discharges was to drain the wetland and make it suitable for row cropping.  The district court found that "[a]s a result of Defendants' levelling, spreading and tiling, Defendants began to grow crops on the site in 1986 and 1987."  Brace, slip op. at 9 (emphasis added).  These facts do not justify the district court's determination that Brace's activities on the site were exempt from the permit requirements as "normal farming activities."  Indeed, the factual findings of the district court can only lead to the opposite conclusion.  Brace converted a thirty-acre site that was not suitable for farming into a site that is suitable for farming, and thus "brought an area into farming use."

Even if Brace's father's pre-1975 use of the site for pasturing could be considered to have been a prior, "established farming operation" on the site, Brace's drainage activities demonstrate that the court erred as a matter of law in finding the exemption from the permit requirement available for his subsequent activities.  Under the regulations, a farming operation is not "ongoing" where "modifications to the hydrological regime are necessary to resume operations."  33

C.F.R. § 323.4(a)(1)(ii); 40 C.F.R. § 232.3(c)(1)(ii)(B).  Here, Brace admitted that "modifications to the hydrological regime," i.e., drainage of the site through excavating and burying four miles of plastic tubing for drainage, were necessary to grow crops on the site.

Our determination is consistent with the holdings of numerous other courts that have found the "normal farming" exemption inapplicable because modifications were required to resume farming.  See, e.g., Akers, 785 F.2d at 819–20 ("[Defendant] argued below that unless he were allowed to complete the work he had started, the effect of which is to drain the wetland, he would be unable to engage in the farming activities he had planned.  By his own admission, his activities require substantial hydrological alteration to [the site], and run afoul of the regulations."); Bayou Marcus Livestock & Agric. Co. v. EPA, No. 88–30275, 20 Envtl. L. Rev. (Envtl. L. Inst.) 20445, 20446 (N.D. Fla. Nov. 3, 1989) ("Before plaintiffs could have effectively harvested the timber and begun farming, it was necessary to dredge, fill, construct roads and dig ditches . . . .  [I]f an ongoing operation had been previously functioning, such changes in the landscape would have been unnecessary."); United States v. Larkins, 657 F. Supp. 76, 85–86 n.23 (W.D. Ky. 1987) ("Activities cease to be established when the property on which they were once conducted `. . . has lain idle so long that modifications to the hydrological regime are necessary to resume operations.'  Reducing the reach of the [site] required modifications of the site's hydrological regime.  Consequently,

even if the wetland had a history of farm use, that use was no longer established at the time [of defendant's activities]." (emphasis by court) (citations omitted)), aff'd, 852 F.2d 189 (6th Cir. 1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131 (1989).

Brace suggests that this line of cases is distinguishable from his circumstances because of, inter alia, the larger size of the farms and wetlands at issue in those cases, and the fact that one site was a habitat for an endangered species.  We cannot agree.  There is no provision in Section 404(f)(1) of the CWA or its implementing regulations under which either the size of a wetland or the effect of discharge activities on wildlife are factors relevant to determining whether particular discharge activities are exempt from the permit requirement.  Although wetland protection in Section 404 serves the important function of protecting wildlife habitats, in addition to several other functions including flood and erosion control and water purification, see 33 C.F.R. § 320.4(b)(2), neither the statute nor the regulations condition the permit requirement on the existence of adverse impacts on wildlife or on the particular size of a wetland.  Indeed, we have upheld determinations of both civil and criminal liability for the discharge of fill material onto a 14-acre wetland site, a substantially smaller site than Brace's, where there was no claim of adverse impact on wildlife. United States v. Pozsgai, 999 F.2d 719 (3d Cir. 1993), cert. denied, __ U.S. __, 114 S. Ct. 1052 (1994) (civil), and United

States v. Pozsgai, 897 F.2d 524 (3d Cir.), cert. denied, 498 U.S. 812, 111 S. Ct. 48 (1990) (criminal).

In addition to the district court's erroneous interpretation of the "established farming operation" requirement, the district court erred as a matter of law in finding that Brace's installation of a drainage system at the site "is a normal farming activity in order to make land suitable for farming," because "[e]xtensive underground drainage systems are typical and necessary aspects of farming in Erie County." Brace, slip op. at 3. Brace argues that the court correctly considered the area-specific context in its fact finding inquiry. However, this factual determination is a legal conclusion, and is not merely a matter for factual findings. The question is not whether farmers in a particular county install extensive drainage systems. Rather, the proper question is whether the activities performed by Brace at this particular site, and at a time when the CWA applied, were within the meaning of the statutory term "normal farming activities" as defined by the regulations. Regardless of how "typical" or "necessary" such drainage systems may be in Erie County, Section 404 of the CWA requires a permit for "activities which bring an area into farming . . . use," as opposed to activities that are part of an "established farming operation." Brace did not have an "established farming operation" on the site prior to his discharges, and brought the site into farming use by discharging pollutants into waters of the United States.

Moreover, the district court erred in relying upon a determination from the ASCS in September of 1988 that Brace had

"commenced conversion" of his property from wetland to cropland prior to December 23, 1985, as evidence of an "established farming operation" at the site. The USDA Swampbuster Commenced and Third-Party Determinations form signed by Brace expressly states that "[t]he granting of a commencement . . . does not remove other legal requirements that may be required under State or Federal water laws." USDA Form; App. at 173. The purpose of the "commenced conversion" determination is solely to prevent the loss of USDA benefits. The ASCS determination is not a dispositive factor in our analysis.

Moreover, to the extent that the ASCS determination has any relevance to our analysis of "normal farming activities," it undermines such a conclusion. The very title of the determination -- "commenced conversion" -- indicates that Brace's discharge activities were not part of an ongoing farming operation, but rather, were directed at converting the wetland to the farming operation of growing crops. Even if the ASCS determination had stated that a conversion had been completed by December 23, 1985, the CWA permit requirement would not have been affected. Brace's activities were unpermitted and unauthorized when they occurred, and the "commenced conversion" determination provides no basis for an after-the-fact legitimization of those activities.

B.

As we explained above, the regulation governing the "normal farming activities" exemption has a second prong, under which drainage activities, in addition to being a part of an "established farming operation" as defined by the regulation, must be "in accordance with definitions in § 323.4(a)(1)(iii)." 33 C.F.R. § 323.4(a)(1)(ii). Brace's activities failed to meet the requirements of this second prong in addition to not being a part of an ongoing, established farming operation. Brace's undisputed activities: (1) excavating soil and discharging in connection with burying approximately four miles of plastic tubing for drainage; (2) levelling and clearing the formerly wooded and vegetated site; and (3) spreading dredged material, are all excluded from the activities allowed under 33 C.F.R. § 323.4(a)(1)(iii).

Brace's installation of four miles of tubing which drains the site is barred by the provision's express prohibition of both: (1) "the construction of any . . . structure which drains or otherwise significantly modifies . . . a wetland or aquatic area constituting waters of the United States"; and (2) "drainage associated with the immediate or gradual conversion of a wetland to a non-wetland . . ., or conversion from one wetland use to another." 33 C.F.R. § 323.4(a)(1)(iii)(C)(2). See also 40 C.F.R. § 232.3(d)(3)(D)(ii). Brace's clearing of all vegetation from the wetland site, and his spreading of dredged materials onto the site, are barred by the provision's express prohibition of both: (1) "the redistribution of soil, rock, sand, or other surficial materials in a manner which changes any area of the

waters of the United States to dryland"; and (2) "the redistribution of surface materials by blading, grading, or other means to fill in wetland areas."  33 C.F.R. § 323.4(a)(1)(iii)(D).  See also 40 C.F.R. § 232.3(d)(4). Accordingly, by definition, Brace's discharge activities cannot constitute "normal farming activities" under the applicable regulation.

We are unpersuaded by Brace's assertion that we need not reach the definitions of 33 C.F.R. § 323.4(a)(1)(iii) because there was no conversion from one wetland use to another.  Brace bases his argument on the district court's determination that Brace simply maintained and improved his drainage system, and continued, piece by piece, to farm land which, in one form or another, had always been used for crops or pasture.  Brace asserts that spreading materials that he dredged from ditches on the site onto other portions of the site was an ordinary and normal maintenance procedure employed by local farmers.   Under the CWA, a permit is not required for the discharge of dredged or fill material for the purpose of maintaining drainage ditches. 33 U.S.C. § 1344(f)(1)(C).  Thus, Brace argues and the district court agreed that Brace's activities constituted maintenance of drainage ditches, an activity clearly exempt from the permit requirements of the CWA.

The exemption from the permit requirements under Section 404(f)(1)(C) for "maintenance of drainage ditches" applies to "any discharge of dredged or fill material that may result from . . . the maintenance (but not construction) of drainage ditches."

33 C.F.R. § 323.4(a)(3) (emphasis added). We find the district court erred as a matter of law in finding that Brace was simply maintaining rather than constructing the drainage ditches. Likewise, the conclusion of the district court that the activities of Brace do not require a permit because they constitute maintenance of drainage ditches, Brace, slip op. at 22, is not supported by the evidence. Brace caused the excavation of the site and the burying of several miles of plastic tubing to facilitate drainage. It is not realistic to describe what Brace was doing as "continuing maintenance." Brace's construction of a drainage system absent a permit was expressly prohibited by the regulation absent a permit. See Huebner, 752 F.2d at 1242 (defendants' cleaning and deepening existing ditches, excavating a new ditch, and discharging dredged materials required a permit when it brought an area of navigable waters into a use to which it was not previously subject).

Moreover, any activity that could be described as maintenance of drainage ditches was accomplished, if at all, by dredging ditches at the site. Brace's subsequent levelling at the site and spreading of the dredged material were separate, independent activities that are not subject to an exemption from the permit requirement. This subsequent spreading of dredged materials onto other portions of the site served no purpose beyond converting the thirty-acre wetland site to an upland site that could accommodate the growing of crops; it did not "result" from the maintenance of drainage ditches. There is no statutory or regulatory provision under which the spreading of the dredged

materials is permissible absent a permit.  The district court erred as a matter of law in holding Brace's activities permissible.

V.

As we discussed above, Brace has the burden of proving both that he qualifies under Section 404(f)(1) for the normal farming activities exemption, and that the permit requirement was not "recaptured" under Section 404(f)(2) of the CWA, 33 U.S.C. § 1344(f)(2).  The "recapture" provision stipulates that:

> Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

33 U.S.C. § 1344(f)(2).  The applicable regulation provides that "[a] conversion of a section 404 wetland to a non-wetland is a change in use of an area of the waters of the United States."  33 C.F.R. § 323.4(c).

Initially, the district court incorrectly stated that the application of the recapture provision required the United States to establish the two elements:

> First, it must be established that Brace's activities were conducted in order to bring the property into a use to which it was not previously subject.  Second, if this element is established, it must then be established that Brace's activities will impair the flow or circulation of navigable waters or will reduce the reach of such waters.

Brace, slip op. at 21.  The court's articulation of the legal standard implies that the burden of demonstrating "recapture" is on the United States.  This legal standard is erroneous.

Since we have held that Brace's drainage activities on the thirty-acre wetland site are not exempt from the CWA permit requirement under the "normal farming activities" or maintenance of drainage ditches exemptions, we need not reach the application of the recapture provision.  We note, however, that the district court's conclusion that the recapture provision does not apply because "[t]he land is not being converted to a use to which it was not previously subject, nor has significant impairment to the reach or flow of waters been proven," Brace, slip op. at 22, is incorrect as a matter of law.  The evidence establishes that Brace's activities drained the site to convert it from a wetland to a new, non-wetland use:  the district court found that the site was inundated with water at various times in the past; the parties stipulated, and the court found, that the site constituted a wetland at the time of the discharges; Brace admitted that the purpose of installing the four miles of plastic tubing at the site in 1986 and 1987, and of clearing the vegetation from the site between 1985 and 1987, was to drain the site and make the ground ready for growing crops; and the court found that as a result of Brace's levelling, spreading and tiling, he began to grow crops on the site in 1986 and 1987.  Thus, Brace's activities fall squarely within the statutory definition of "recapture."

VI.


The last issue that we must address is that of Brace's penalty for violations of the permit requirements of Section 404 of the CWA and for his violations of the EPA administrative orders. Clearly, under the CWA Section 309(d), Brace is subject to a civil penalty for his violation of the CWA permit requirements. 33 U.S.C. § 1319(d) (1988).[3] Upon remand the district court must determine the appropriate amount of the penalty, based on the statutory factors delineated in Section 309(d).

The more difficult issue is whether Brace is also subject to civil penalties for his noncompliance with the EPA administrative orders. The district court found both that: (1) the EPA's administrative order had required Brace "to cease and desist all activities on the site," Brace, slip op. at 14; and (2)

---

[3]. Section 1319(d) provides in pertinent part:

> Any person who violates section 1311, 1312, 1316, 1317, 1318, 1328, or 1345 of this title, or any permit condition or limitation implementing any of such sections in a permit issued under section . . . 1344 of this title by a State, . . . and any person who violates any order issued by the Administrator under subsection (a) of this section, shall be subject to a civil penalty not to exceed $25,000 per day for each violation. In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

"Defendants failed to totally comply with Administrative Orders issued to them."  Brace, slip op. at 14.  However, the district court did not attach liability for violating the orders, based on its findings that "Defendants have not disturbed the soil on the site in any significant way since being served with the cease and desist orders, and in the view of this Court acted only out of sincere conviction, although undoubtedly misguided."  Id.

Section 309(d) provides that "any person who violates any order issued by the Administrator under subsection (a) of this section, shall be subject to a civil penalty."  33 U.S.C. § 1319(d).  Section 309(d) does not afford the district court discretion to grant an exemption from liability for violating the EPA administrative orders.  See, e.g., Atlantic States Legal Foundation v. Tyson Foods, 897 F.2d 1128, 1142 (11th Cir. 1990) (the language of Section 309(d) "makes clear that once a violation has been established, some form of penalty is required.")  However, the record is not sufficiently clear for us to determine whether civil penalties are mandatory under the circumstances of this case.  We remand this issue to the district court for further review of Brace's non-compliance with the EPA administrative orders.  Thereafter, the district court must determine what, if any, civil penalties should be assessed against Brace for his violations of the EPA administrative orders.

VII. **CONCLUSION**

For the foregoing reasons, the order entered December 17, 1993, granting judgment in favor of the defendants, Robert Brace and Robert Brace Farms, Inc., will be reversed. This matter will be remanded to the district court to enter judgment in favor of the United States and to assess upon further proceedings appropriate penalties for defendants' violations of the permit requirements, and to assess what, if any, penalties are appropriate for violations of the EPA administrative orders.