[No. B097113. Second Dist., Div. Six. Nov. 7, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
FREDERICK JOHN APPEL, Defendant and Appellant.

496

**COUNSEL**

Kate M. Neiswender for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Pamela C. Hamanaka and Ann Rushton, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GILBERT, J.**—Frederick John Appel was charged with knowingly discharging pollutants into the waters of the United States between May 10, 1992, and December 23, 1994. (Wat. Code, § 13387, subd. (a)(4).) A jury found him guilty.

On appeal he contends that his conviction was unconstitutional to the extent that it relied on acts occurring prior to an April of 1994 jurisdictional

determination; that federal law provides for no criminal penalties and pre-empts California law; that he was denied due process because he had no prior opportunity to challenge the jurisdictional determination; that the trial court erred in refusing to allow him to apply the "converted cropland" exception as a defense; and that he was denied due process by the prosecution's failure to bring the charge until after floods washed away evidence. We affirm.

## FACTS

Appel owns a parcel of property of approximately 30 acres. The Ventura River runs through the center of the property and also at its western boundary. San Antonio Creek comes through a corner of the property and empties into the Ventura River. The Ventura River is typical of Southern California rivers. It has a "braided" system of channels within a broad floodplain.

Appel purchased the parcel in 1989 for $25,000. The price was low because it had a limited potential for use. When Appel acquired the property it was overgrown with vegetation. Appel owned a tree trimming and bush removal service. He had some heavy equipment, including a 55,000-pound track loader designed to clear brush, logs and debris.

On December 31, 1993, some neighbors of Appel contacted State Fish and Game Warden Jorge Gross about Appel's activities in the Ventura River. Gross went to the site and saw a levee being constructed on a low-flow channel of the river. He noticed that the levee was being built in the river bottom. Gross described the location of the levee as "pretty much in the middle of the river."

Gross followed the sound of heavy equipment being operated, and found Appel on a bulldozer. Appel was knocking down some riparian vegetation and leveling out the area. At the time Appel was working on a neighboring parcel known as the Drapeau property.

Gross asked Appel if he had a stream bed alteration agreement. Appel said he did not need one. Appel mentioned he was doing similar work on his property. When Gross told Appel he was going to look at his property, Appel told Gross he needed a warrant. Gross did not believe he needed a warrant, but he did not enter Appel's property.

Looking from the Drapeau property, however, Gross could see "quite a bit of alteration of the river bottom" on Appel's property. There were places

where fill material had been brought in which raised the elevation of the river bottom, making a platform above the regular contours of the river. The fill included nonnative rock and vegetation such as palm trees. There were flat areas devoid of vegetation where it had been obviously knocked down.

Gross said he did not need to determine the extent of the high water mark to know Appel was working in the bed of the Ventura River because it was obvious. Gross told Appel that he was working in the riverbed and that he needed a stream bed alteration agreement. Appel said he was not subject to the laws of California. Gross told Appel what he was doing was illegal and if Appel had any doubt, the best way to resolve it was to apply for an agreement. Appel said if Gross did not cite him he was going to continue. Gross left the property without citing him.

Gross returned on January 14, 1994, entering both the Drapeau and Appel parcels. The amount of work had doubled since the last time he was there. New soil had been placed on the levee, and rocks and other material had been removed even from the low flow channel to help make the levee. Near a logjam Gross found a western pond turtle that had been sliced in half lying in a bulldozer track. Appel told Gross that he built the levee on the Drapeau parcel to divert water from his parcel.

Karen Grigsby, a former neighbor of Appel, testified that her first visit to the property was shortly after Appel purchased it. She said she saw only one dead tree on that first visit. After the purchase, Appel dumped tree trimming material on the land.

On December 24, 1993, Grigsby saw Appel using a bulldozer to construct the levee on the Drapeau's upstream property. Whole trees were being used to construct the levee. After Appel built the dam she never observed any water in the river channel.

Another neighbor, Paul Wegner, testified Appel dumped tree trimmings including a large number of cut palm trees on the property. This began as soon as Appel acquired the property. There were piles of cut palm trees all over the property. Wegner saw palm trees deposited along the eastern bank of the western channel of the river. In November of 1994 Wegner saw eucalyptus trees deposited "right on the edge of the river."

During a flood in 1995, Wegner saw "palm trees popping up off [Appel's] property and floating down [the river]." After the flood Wegner saw hundreds of cut palm and eucalyptus trees along the river downstream from Appel's property. He saw none north of the property. At the beach he saw

cut palm and eucalyptus trees. He also saw a great many cut palm trees in the ocean, "floating all over and definitely nailing the pier."

Wegner moved to his property in 1989. When he was new to the area he had conversations with Appel concerning the need for preparedness and caution about floods. Appel explained how powerful the river was and what it could do and showed Wegner pictures of previous floods.

In a conversation with Wegner, Appel explained his philosophy for dealing with government. Appel told Wegner, "[N]ever respond to any government agencies, state, local, basically anybody with authority . . . and never respond, never return phone calls . . . never fill out forms . . . just completely do not cooperate." Wegner said Appel thought he was a fool for obtaining a business license.

Kenneth Wilson, an environmental specialist for the Department of Fish and Game, visited the property in January and February of 1993. Wilson saw piles of debris along the edge of the slope of the low flow channel, disturbed areas where bulldozers had been working in the river bed and graded roads. Wilson returned with Gross to the area on January 14, 1995. He saw evidence of fill in the riverbed. Some of the low flow or secondary or tertiary braids of the river were filled. The fill was from a source other than the riverbed.

On January 4, 1993, Michael Jewell of the Army Corps of Engineers received an anonymous telephone call reporting grading and filling in a portion of the Ventura River. After a site visit the district engineer issued a cease-and-desist order. Appel replied that the corps had no jurisdiction. The corps wrote to Appel telling him that it could come out to his property to do a jurisdictional determination. A number of telephone conversations between Jewell and Appel failed to resolve the matter. Appel said he would get back to Jewell, but never did. Jewell tried to contact Appel several times without success. Finally Jewell turned the matter over the Environmental Protection Agency (EPA). Jewell continued to visit the site monthly and saw evidence of continuing work.

Arron Setran, an environmental scientist with the EPA, called Appel's residence in November of 1993. He identified himself and his agency and asked if Appel would call back. Receiving no response he called a second time. Still receiving no response he wrote asking Appel's cooperation in investigating the activities on his parcel. Appel responded that the federal government had no jurisdiction. The EPA obtained a warrant on February 1, 1994.

Setran entered the property pursuant to the warrant. He described the property as looking "like somebody took a bulldozer and just went on a joyride." He saw that someone had shredded tree or bush material and laid it down three or four feet thick "in a swath as far as you can see for a couple a hundred yards, probably." He said the material encroached on the waters of the United States. He saw vegetative material encroaching into a "live stream." He also saw a road built across a live stream in the middle of the parcel.

A jurisdictional survey of the property to determine the boundaries of the waters of the United States, that is, the ordinary high water mark, was completed by the EPA in April of 1994. Because the property had been so substantially altered, the EPA had to use aerial photographs to determine where the river channels had been. A second cease-and-desist order was issued after the survey was completed.

Even after the survey was completed further inspection showed that additional work had been done. Setran saw a vegetative mound about the size of the courtroom and eight to ten feet high on the bank of the river. He saw eucalyptus trees placed on an artificial bank in the waters of the United States.

Floods in January of 1995 washed away much of the fill material and vegetation that had been dumped on the property. The floods revealed a dark band of fill material that had been placed "on the normal elevation of the stream bed."

DISCUSSION

I

Appel contends his conviction was unconstitutional to the extent it relied on acts performed prior to the EPA's jurisdictional determination in April of 1994. He claims that until that time even the EPA could not say with certainty which areas of his property were waters of the United States.

Appel bases his claim of unconstitutionality on the ex post facto clauses of the United States and California Constitutions. (U.S. Const., art. I, §§ 9, 10; Cal. Const., art. I, § 9.) But an ex post facto law is a retrospective statute. (7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 419, p. 601.) Here the statute under which Appel was prosecuted was enacted prior to the acts with which he was charged. Thus there is no ex post facto violation.

■ Appel emphasizes his claim that the statute is vague. A statute violates the due process clause if it is so indefinite that it does not give fair warning of the conduct that gives rise to criminal penalties. (See 7 Witkin, Summary of Cal. Law, *supra*, Constitutional Law, § 104, p. 157.)

Water Code section 13387, subdivision (a)(4) makes it a crime to violate any requirement of section 301 of the Federal Water Pollution Control Act (FWPCA), as amended. Section 301 prohibits the discharge of any pollutant into the waters of the United States. (33 U.S.C. §§ 1311, 1362(7) & (12).) A pollutant includes dredged soil, solid waste, rock and sand. (33 U.S.C. § 1362(6).) The waters of the United States include rivers and streams that are tributaries of tidal waters. (33 C.F.R. § 328.3(a)(1), (3) and (5) (1996).) The jurisdictional limit of such waters of the United States is the "ordinary high water mark." (33 C.F.R. § 328.3(e) (1996).)

The term "waters of the United States" has been held not to be unconstitutionally vague. (See *United States* v. *Phelps Dodge Corporation* (D.Ariz. 1975) 391 F.Supp. 1181, 1184-1187 [term not vague as applied to normally dry arroyo]; see also *Avoyelles Sportmen's League, Inc.* v. *Marsh* (5th Cir. 1983) 715 F.2d 897, 917 [term "wetlands" not so vague as to deprive landowners of notice they may be subject to criminal liability].)

■ Appel relies on the testimony of Michael Jewell of the Army Corps of Engineers. Jewell conceded that prior to the jurisdictional determination in April of 1994, he could not have told Appel what the limits of the government's jurisdiction were. But the record is replete with many attempts by governmental agencies to obtain Appel's cooperation in making a jurisdictional determination. Appel's response was true to his philosophy for dealing with government: "just completely do not cooperate."

It was only by virtue of a warrant that the EPA was able to make its jurisdictional determination. Appel cannot refuse to allow a jurisdictional determination to be made and then complain he did not know the limits of the government's jurisdiction. (See *United States* v. *Byrd* (7th Cir. 1970) 609 F.2d 1204, 1209 [defendant who refused to permit his land to be surveyed could not complain of the absence of a legal description of wetlands]; see also *Avoyelles Sportmen's League, Inc.* v. *Marsh, supra,* 715 F.2d at p. 917 [if landowners had wished to protect themselves from liability they could have applied for a permit].)

In any event, this is not a case that turns on the precise location of the ordinary high water mark. The evidence presented at trial, including the exhibits, shows that no reasonable person could have failed to notice that the

construction of the levee, much of the grade and fill work and some dumping of debris were being done inside a riverbed. Moreover, Appel discussed with his neighbor, Wegner, the propensity of the river to flood and the power of the floodwaters. Appel must have known that dumping debris near the river channels made it not only foreseeable but inevitable that the debris would end up in the river. Certainly the neighbors who reported Appel to the authorities had no difficulty in determining his activities were illegal.

## II

■   Appel next contends that the State of California is precluded from prosecuting him because federal law provides for no criminal penalties and preempts California law.

Appel is wrong that federal law does not provide for criminal penalties. The FWPCA provides in part that anyone who knowingly violates 33 United States Code section 1319(c)(2) "shall be punished by a fine of not less than $5,000 nor more than $50,000 per day of violation, or by imprisonment for not more than 3 years, or by both. If a conviction of a person is for a violation committed after a first conviction of such person under this paragraph, punishment shall be by a fine of not more than $100,000 per day of violation, or by imprisonment of not more than 6 years, or by both."

Appel is also wrong about federal preemption. Title 33 United States Code section 1251(b), which is part of the FWPCA, provides in part: "It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources . . . ."

Thus Congress expressly recognized that control of water pollution is primarily the responsibility of the states.

## III

■   Appel claims his right to due process was violated because he had no opportunity to challenge the EPA's jurisdictional determination prior to it being used against him.

Appel had the opportunity to challenge the jurisdictional determination at trial. He took advantage of the opportunity. He called a civil engineer to

testify and challenged the jurisdictional determination in his own testimony. Due process was satisfied. There is no due process right to a pretrial challenge.

Appel points to 33 United States Code section 1319(g). That subdivision concerns administrative penalties in the form of civil fines. It allows for notice and a public hearing. But there is no requirement that an administrative or other civil action be pursued prior to bringing a criminal action. (See *United States* v. *Frezzo Bros. Inc.* (3d Cir. 1979) 602 F.2d 1123, 1126.)

Had Appel wished a public hearing to challenge the jurisdictional determination prior to criminal charges being brought he could have applied for a dredge and fill permit. (33 U.S.C. § 1344.) By applying for the permit he could have had a public hearing at which all substantial issues would be determined. (33 C.F.R. § 327.4(b) (1996).) Instead, Appel steadfastly refused to cooperate.

## IV

■ Appel contends the trial court erred in refusing to allow him to apply the "converted cropland" exemption as a defense. The trial court determined that the exemption did not apply as a matter of law.

Title 33 United States Code section 1344(f)(1)(A) provides in part that, subject to paragraph (2), the discharge of dredged or fill material "from normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices . . . [¶] . . . is not prohibited or otherwise subject to regulation . . . ."

Paragraph (2) of the subsection is known as the "Recapture" provision. It provides, "Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section."

To fall under the converted cropland exemption the activities "must be part of an established (i.e., on-going) farming, silviculture, or ranching operation . . . . An operation ceases to be established when the area on which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume

operations." (33 C.F.R. § 323.4(a)(1)(ii) (1996).) The defendant has the burden of showing both that his activities fall within the exemption of paragraph (1) and avoid the recapture provisions of paragraph (2). (*United States* v. *Brace* (3d Cir. 1994) 41 F.3d 117, 124.) Here, it is uncontested that Appel's parcel had not been used for agricultural purposes at least since 1969 until Appel purchased the property in 1989. Appel's farming activities consisted of grazing from seven to fifty-two sheep and an attempt to establish a pumpkin patch.

Because the land had not been used for farming for at least 20 years, Appel's activities cannot as a matter of law qualify as part of an ongoing farming operation. Even if Appel's activities were conducted in an effort to resume farming operations, they definitely involved modifications to the hydrological regime. As a matter of law Appel was not entitled to the converted cropland exemption.

## V

Appel contends he was denied due process when evidence of his alleged fill activities was completely destroyed by the January 1995 floods. He argues the prosecution had the opportunity to bring the charges earlier, but failed to do so. He claims he was deprived of the opportunity of showing that what the prosecution alleged was fill was actually natural river deposits.

A claim that preindictment delay constitutes a denial of due process is judged by "balancing of the prejudicial effect of the delay and the justification therefor." (*Scherling* v. *Superior Court* (1978) 22 Cal.3d 493, 504 [149 Cal.Rptr. 597, 585 P.2d 219].) The burden is on the defendant to establish prejudice. (*People* v. *Archerd* (1970) 3 Cal.3d 615, 640 [91 Cal.Rptr. 397, 477 P.2d 421].)

Here Appel was charged with ongoing illegal conduct stretching from May 10, 1992, through December 23, 1994. Appel cites no case for the proposition that there is any delay in bringing charges where the crime with which the defendant is charged involves ongoing illegal conduct.

Even if there were such a delay Appel has failed to show prejudice. Appel knew long prior to the January 1995 floods that he was under investigation for illegal activities occurring on his land. If he failed to know precisely what activities the authorities considered illegal, it was only because he refused to listen. If he was concerned about preserving evidence of his innocence, he had the opportunity to do so in the same manner the prosecution preserved evidence of his guilt: through photographs and reliable witnesses. Appel certainly had at least as much knowledge as the prosecution of

the ability of the river to wash away the evidence. Moreover, it was the prosecution's burden to show that the material washed away in the flood was fill and not natural deposits. It is difficult to see how the destruction of the prosecution's evidence could be prejudicial to the defendant.

The judgment granting probation is affirmed. The stay on jail time previously ordered by trial court is vacated.

Stone (S. J.), P. J., and Yegan, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 19, 1997.