**UNITED STATES of America, Plaintiff,**

v.

**SARGENT COUNTY WATER RESOURCE DISTRICT, a political subdivision for the State of North Dakota, The State of North Dakota, Moore Engineering, Inc., and Radniecki Construction Company, Inc., Defendants.**

Civ. No. A3–88–175.

United States District Court,
D. North Dakota,
Southeastern Division.

Dec. 30, 1994.

### MEMORANDUM AND ORDER

WEBB, Chief Judge.

This is a dispute between the United States of America and the Sargent County Water Resource District (hereinafter "County") over work the County did on a drainage ditch that bisects three sloughs. The federal government brought this action seeking injunctive relief and civil penalties for violations of the Clean Water Act ("Act"), 33 U.S.C. §§ 1251–1376. The objective of the Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's water." 33 U.S.C. § 1251(a). The Act prohibits the discharge of dredged or fill materials into "navigable waters"—defined as "waters of the United States"—unless authorized by a permit issued by the Army Corps of Engineers (hereinafter "Corps") pursuant to 33 U.S.C. § 1344. *See generally,* 33 U.S.C. § 1311, 1344. Limited exemptions from the permit requirement are found in § 1344(f), which provides in pertinent part:

**(f) Non-prohibited discharge of dredged or fill material**

(1) Except as provided in paragraph (2) of this subsection, the discharge of dredged or fill material—

. . . .

(C) for the purpose of construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches;

. . . .

is not prohibited by or otherwise subject to regulation under this section. . . .

(2) Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its primary purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the

reach of such waters be reduced, shall be required to have a permit under this section.

33 U.S.C. § 1344(f). The United States of America argues the work the County directed required a permit under 33 U.S.C. § 1344, while the County argues that the work was exempt as maintenance under 33 U.S.C. § 1344(f).

This court previously ruled it had jurisdiction to hear the case. A bench trial on the issue of liability concluded on November 16, 1994, and this order follows.

## FACTS

Sargent County is located in southeastern North Dakota. The southern boundary borders South Dakota and the eastern boundary is relatively close to Minnesota. Bruns Slough is the northern-most of the three sloughs and is bisected by North Dakota Highway 13, which provides easy access. Meszaros Slough, the southern-most slough, is also easily accessed due to its proximity to North Dakota Highway 11 and a well maintained county road.

In 1917, Sargent County began construction of Sargent County Drain 11, the drainage ditch here in question. This drainage ditch is about twenty-five miles long and cuts through Bruns, Big, and Meszaros Sloughs, respectively, before draining into the Wild Rice River near Brampton, North Dakota. The ditch was originally constructed to provide an out-fall for surface runoff for a large portion of the western part of Sargent County. Completed in the early 1920's, the drainage ditch was successful as Bruns, Big, and Meszaros Sloughs were entirely drained as a result of the work.

The recorded history of the drainage ditch is extensive. Mr. Samuel Denton designed the ditch and oversaw portions of its original construction. Denton was replaced by W.B. Stevenson, who conducted the first survey of the drainage ditch bottom in 1919, prior to its completion. The 1919 survey was referred to throughout trial as the "as built" profile even though the survey did not account for the last seven miles of the ditch which was not built at the time Stevenson did his survey, and it did not account for any improvements

that were subsequently made based on Stevenson's recommendation after he completed his survey. A true "as built" survey was never found. The next known survey of the ditch occurred in 1969 when the United States Bureau of Reclamation conducted a survey as part of the Garrison Diversion Project. This is known as the "USBR–1969" survey. In 1990, after the work here at issue had been completed, a final survey was conducted at the request of the government by Resource Consultants, Inc., and is known as the "RCI–1990" survey.

In the early 1980's, Moore Engineering, Inc. (hereinafter "Moore"), was retained by the County and charged with developing a profile of the bottom of the drainage ditch as it existed upon its completion in the early 1920's. The original design drawings, the 1919 "as built" survey, and the "USBR–1969" survey were all used by Moore to complete this work. Mr. Jeffry Volk, the project engineer with Moore who oversaw the development of the profile, testified that although the County explored different alternatives, including improving the drain, it concluded that the best option was a clean-out of the drain. The cost of improving the drain would have been prohibitive and could not be justified. Volk also testified to some of the problems he encountered in reviewing Denton's design with Stevenson's "as built" survey and recommendations to arrive at an accurate "as built" profile. Denton and Stevenson started their work at different locations, with different base elevations, so many of their profile drawing lines did not match up. Volk recalled an instance where there was a three and one-half to four foot grade elevation difference between one sheet and another. Another problem was that Stevenson recommended various improvements to the drain based on the 1919 "as built" survey, but because no survey was conducted at the conclusion of all the original work, Volk was not entirely sure of the drain's actual as built profile. Nonetheless, based primarily on information taken from Denton's design drawings, Stevenson's 1919 "as built" survey, and the "USBR–1969" survey, Volk developed a profile of the drainage ditch bottom as it

existed at the completion of the work in the 1920's.

Concerned about the cost of the clean-out of the ditch, the County sought to obtain financial assistance from the state. The state provides funds for new construction, but not for maintenance. The state considered the work to be performed on the drainage ditch to be strictly maintenance, and therefore, would not assist the County in funding the project. The project proceeded without state funding.

Once Moore had completed its profile of the drainage ditch, the County contracted with Radniecki Construction Co. (hereinafter "Radniecki") to perform the clean-out. Although Radniecki utilized the profile drawings provided by Moore in conducting its work, Moore was not involved in the actual clean-out in any other material way. It did set depth stakes to show Radniecki how deep to dig the drain, but these stakes were not critical to the performance of the work.

Greg Radniecki, a principal with Radniecki Construction Co., and his uncle, Virgil Radniecki, performed most of the work on the drain. Greg testified that his company was directed by the County to clean the ditch down to its original grade. Several County board members verified these instructions. Radniecki was to clean the ditch to original grade by following stakes which were placed along the drain by Moore, and in areas where there were no stakes, to follow the profile drawing developed by Moore. Radniecki's work began in 1984 and continued through the early part of 1987. Greg Radniecki testified that he removed debris and silt, and that the amount of silt he removed from the ditch ranged from one half to one foot in some areas to as much as four feet in other locations. He indicated the best way for him to be sure he was excavating to original grade was to observe the color and density of the excavated material. He noted that silt is black and that the old ditch bottom had more of a yellowish-gray coloring. The virgin soil of the old ditch bottom was also much harder, more dense soil. Virgil's testimony on these matters was consistent. Both Greg and Virgil testified that it was a relatively easy process to determine what was and was not virgin soil, and although there were areas where each excavated virgin soil, corrections were made to the dragline within 20 feet to ensure that only silt was being excavated. Greg and Virgil were experienced dragline operators and each testified their work consisted only of returning the ditch to its pre-existing depth and did not include deepening or widening the ditch.

The work extended throughout the length of the ditch, including within the sloughs themselves. Greg Radniecki testified that the amount of excavation from the ditch within each of three sloughs was light, averaging about a foot of silt. Radniecki would either sidecast the excavated materials into the sloughs or, more often, place the excavated material on top of old spoil piles from earlier work. However, in some areas the spoil piles were either submerged or could not be found.

Detailed charts outlining and comparing the profiles of the 1919 "as built" survey, the "USBR–1969" survey, Moore's proposed design, and the "RCI–1990" survey were received and reviewed by the court. Because the 1919 "as built" survey did not cover the entire length of the ditch, these charts include the 1919 recommended design from Meszaros Slough through the last seven miles of the ditch. In the 1990 survey, the last seven miles were about a foot deeper than reflected in the 1919 recommended design. However, the court notes the 1969 survey (even with the silt fill-in) shows deeper depths than the 1919 design. This indicates that in 1969 the actual ditch bottom was deeper than the 1919 design, probably because the original work did not follow the design.

While the 1990 survey also shows that the drain was deeper than the 1919 depth for about two miles between Big and Meszaros Sloughs, and in a few locations between Bruns and Big Slough, the court notes that in at least two locations the 1969 survey (with the silt fill-in) reflects a deeper depth than the 1919 survey. This suggests either there was work performed on the ditch sometime after its original construction or the ditch had been naturally deepened over time by water erosion.

Lawrence Woodbury, a civil engineer with Houston Engineering, was called as a witness by the County. Mr. Woodbury has worked extensively on open dirt drainage ditches and has a great deal of experience in the construction and maintenance of drainage ditches. He has testified previously as an expert in this area on numerous occasions. He testified that he would have approached the project in the same way as Mr. Volk had in trying to reconstruct the original grade lines of the ditch. Mr. Woodbury indicated he had worked previously with Radniecki and that the company was one of the top three dragline operator/contractors in Minnesota during the mid–1980's. He confirmed Radniecki's observation that soil color is the best indication of having reached original grade. Mr. Woodbury also testified that commonly accepted engineering standards for the maintenance of drainage ditches in the Red River Valley is a tolerance of plus or minus one tenth to two tenths of a foot for cleaning a dry channel, and a tolerance of plus or minus one half foot in a wet channel. It was Mr. Woodbury's conclusion that the work performed by Radniecki was within the accepted tolerance levels for cleaning drainage ditches in the Red River Valley.

Mr. Arden Mathison, a 32 year employee with the United States Bureau of Reclamation (hereinafter "Bureau"), testified next for the County. He discussed return flow studies he was involved with in connection with the East Oakes portion of the Garrison Diversion Project. He indicated that in the late 1970's, Drain 11 was being considered for use as the East Oakes outlet for Garrison Diversion. At the time this alternative was being explored, the Bureau was evaluating the amount of wetlands required to mitigate or offset the loss resulting from making Drain 11 an outlet for Garrison Diversion. Although the plan called for deepening and widening the ditch beyond its original construction, the Bureau's position was that it would not have to mitigate at all for losses in wetlands attributed to cleaning the drain to its original grade; it would only have to mitigate for losses resulting from deepening or widening the ditch beyond its original construction.

Mr. Cary Backstrand, the Chief of Regulatory Section for the North Dakota Water Commission, also testified. He explained the North Dakota Water Commission does not fund drain maintenance projects, and because it viewed the work in question as maintenance of an existing drain only, it denied the County's request for financial assistance. He testified that he first became aware of the Corps' position that a 404(f) permit was required for the work when he received a copy of their April 29, 1986 letter to the County. Mr. Backstrand replied to the Corps in writing on May 8, 1986, and again on June 12, 1986, indicating that he did not agree that a 404(f) permit was required. In his June 12, 1986 letter to the Corps, Mr. Backstrand stated:

> There are two specific reasons why, in my opinion, a 404 permit is not required. One, the area in question is not "bordering, contiguous or neighboring," to navigable waters of the United States and thus is not an adjacent wetland within the meaning of the Corps' Section 404 regulations.

> Two, even if this area is within the Corps' Section 404 regulations, it is specifically exempt in accordance with Section 404 ( [f] )(1), [s]ubsection C "... [c]onstruction or maintenance of farm or stockponds or irrigation ditches, or the maintenance of drainage ditch[es];"

(Letter from Backstrand to Keller of 6/12/86). At trial, Mr. Backstrand was still of the opinion that a 404(b) permit was not required.

The next to testify was Mr. Royce Kline. Mr. Kline received a masters degree in geology from Kansas State University and has worked extensively in the area of ground water hydrology. He reviewed rainfall levels for the area in question and indicated that the normal amount of rainfall for 1951–1980 time period was approximately 20 inches. Beginning in 1981 and extending through 1992, the area experienced dry to normal conditions for all years except for 1986, when it was wet all over, and 1989, when it was wet in the northwestern portion of Sargent County. There was above average rainfall in 1993 and 1994, which resulted in Meszaros, Big, and Bruns Slough being either full of water

or very wet in each of these years. Mr. Kline also testified at length about the Englevale Aquifer underlying Bruns and Big Sloughs, and the affect irrigation and climatic changes have on the sloughs. He indicated that water levels in the sloughs basically reflect water levels in the aquifer underlying the sloughs. Mr. Kline testified that irrigation pumping, which began in this area in the 1950's, also adversely affects water levels in the sloughs, but that the dominant effect on water levels in the sloughs was climatic change. Kline's testimony concluded the County's case in chief.

Dr. David Frick was the first witness for the government. He is a civil engineer and Regional Vice President with Resource Consultants, Inc., Fort Collins, Colorado. His expertise is in the area of hydrology and water resources, and he has used computer modeling extensively in his work. He testified that he had reviewed the design drawings for the drainage ditch as well as all the surveys that had been conducted on the drain. He indicated that his firm was hired by the government to conduct a survey in 1990 ("RCI–1990") to determine existing conditions of the drain. The results of the survey were used to model the drain's hydrological capacity, which, in turn, was used to establish whether the drain was more efficient in 1990 than it had been in the past. The hydrological efficiency of a drain may be affected by changing grade (or slope), replacing bridges with culverts, and smoothing out the channel of the drain, among other things. He explained that the best way to determine if there has been a change in hydrological capacity is through the use of a computer model.

Dr. Frick's firm measured representative cross-sections of the drain for modeling purposes. The firm's 1990 survey was plotted alongside the other surveys on the profile sheets, and Dr. Frick examined and explained the points of deviation. He noted the largest amount of excavation occurred south of Big Slough in an area between Stevenson

Stations 330 and 435. The survey his firm conducted suggested that the elevation of the slough in 1990 in this area ranged from near 1919 elevations to as much as two feet below 1919 elevations. He then discussed numerous locations where bridges were replaced with culverts that were set at lower levels and how this affected the drain's efficiency.

In the present instance, the "HEC–2" computer model, an industry standard program model, was used to calculate the drain's efficiency in 1919, 1969, and 1990. Based on the results, Dr. Frick testified that the drain was more efficient in both 1969 and 1990 than it was in 1919. Dr. Frick's testimony that the drain was more efficient in both 1969 and 1990 than it was in 1919 is inconsistent with reason and logic. The court concludes Dr. Frick was mistaken or mistated this conclusion.[1]

Another model, the Wetland Hydrologic Analysis Model (hereinafter "WHAM"), was also used. This model evaluates the inflow and outflow of water from the sloughs, taking into account seepage, evaporation, and precipitation, and determines whether water drains more or less quickly from the sloughs. Based on these results, Dr. Frick concluded that the sloughs drained out faster in 1990 than in either 1919 or 1969. Dr. Frick reviewed all the data available together with the results of his computer modeling, and concluded that while he was not sure of the impact the 1980's work had on Big and Meszaros Sloughs, it was his opinion that the work decreased the water surface elevation by four tenths of a foot in Bruns Slough.

The accuracy of the results of the computer models depends upon the accuracy of the data used, and Dr. Frick testified he was confident of the accuracy of his data. He indicated the survey was accurate within one-tenth to two-tenths of a foot vertically, and within one foot horizontally. He admitted on cross examination, however, that there were errors in elevations in at least ten different locations and in those instances the differ-

---

1. The court notes this bench trial was the first opportunity it had to use real-time court reporting. The court utilized this to verify Dr. Frick's testimony. While suggesting the ditch was more efficient in 1990 than it was in 1919 is both a reasonable and logical assertion; to suggest the ditch was more efficient in 1969, before the work at issue was conducted, than it was in 1919, is neither logical nor reasonable.

ences were averaged. He noted that his evaluation differed from Mr. Kline's in that while both accounted for seepage out of the sloughs, Kline based his findings on there being ground water inflow into the sloughs. Dr. Frick, on the other hand, did not believe there was a significant inflow of ground water, and therefore, did not enter any data to that effect into his computer models. Furthermore, on rebuttal Mr. Kline testified that he differed significantly with Dr. Frick's assessment of seepage rates out of the sloughs. He suggested Dr. Frick's computer allowance for seepage was extremely high, and that this would have also affected the computer model results.

Mr. Gary Erickson and Mr. Allen Sapa of the United States Fish and Wildlife Service each testified after Dr. Frick. Mr. Erickson provided commentary for a videotape of the area produced in 1987, after the work on Drain 11 was completed. Mr. Sapa discussed the interaction between the U.S. Fish and Wildlife Service and the Bureau of Reclamation regarding the amount of mitigation necessary for Garrison Diversion. He stated the two agencies cooperated on an impact statement and determined that all the acres adversely affected by Garrison Diversion had to be accounted for in mitigation.

Mr. Martin Keller, an environmental resource specialist with the United States Army Corps of Engineers, then reviewed several photographs of different portions of the area. The photographs dated back to the 1930's and depicted past dimensions of the wetlands, and how the wetlands were historically used. A 1937 aerial photograph of Big Slough showed that portions of it were being used for haying, a use, Mr. Keller indicated, that was "reasonably compatible" with wetlands. The court notes that haying, like cropping, is a use of wetlands that can only occur in dry times. He indicated that before the 1980's work on the drain, none of the three sloughs had ever been used agriculturally except for haying. He opined that the work adversely impacted the wetlands by reducing the reach of the sloughs and altering the circulation and flow of the water through those wetlands. He acknowledged the dry conditions that existed in the 1980's but did not consider this a period of drought. The court disagrees with this assessment and notes that in ten of the twelve years between 1977 and 1990, there was below average precipitation. This constitutes a drought. Mr. Keller's views struck the court as being colored by his personal emotions and convictions. His testimony compared the late 1980's with the 1970's, rather than with the early 1920's when the ditch was completed, and he was quite uncompromising in his views. Mr. Keller's general credibility was questionable as he failed to acknowledge even obvious facts when adverse to his position.

On cross, Mr. Keller observed numerous photographs taken between the mid–1980's and 1994, and acknowledged that in 1993 and 1994, there was a lot more water in the sloughs than there was in 1984 and 1985, prior to the work being done on the ditch. He also admitted that the original drainage ditch construction in the 1920's would have reduced the reach of the sloughs and impaired the circulation and flow of the water within the wetlands.

Mr. James Winter, also from the U.S. Army Corps of Engineers, then testified that the middle of upper-Bruns Slough was dry enough in 1988 to farm sunflowers. He believed the work on the drain was what made it possible to farm this land. Mr. Winter also testified to the 404 permitting process and explained that a permit is typically obtained by application prior to work being performed. Depending upon the work to be conducted and the impact the work has on existing wetlands, different permits may be obtained. For minor projects, a relatively simple procedure is followed to obtain what is called a Nationwide Permit. Larger projects are subject to a full public review, which may include hearings, before a permit is issued. In some instances, conditional permits are granted whereby the applicant agrees to a mitigation plan for those wetland acres adversely affected or agrees to perform the work in a certain manner. Leveling spoil piles would be an example of this and, had a permit been issued here, the Corps would have made this a condition.

Mr. Winter agreed with Mr. Keller's assessment that the 1980's work adversely impacted the wetlands by reducing the reach of the sloughs and altering the circulation and flow of the water through those wetlands. In his opinion, the presence of spoil piles converted some wetland to upland and impaired the flow of water. He also acknowledged that the original 1919 drainage ditch construction would have reduced the reach of the sloughs and impaired the circulation and flow of the water within the wetlands.

Dr. Gary Krapu, an expert in the habitat of migratory water birds, concluded the government's case by testifying that the 1980's work has been detrimental to the habitat in the three slough areas. He indicated that prior to the work, Bruns Slough was the last body of water to dry out in the area but now other areas hold water longer. Dr. Krapu does not believe the three sloughs can properly hold water for any extended period of time, and because the ability of a slough to hold water directly impacts migratory birds, he believes the work has reduced the value of those wetlands. The court was not impressed by Dr. Krapu's testimony. His expertise is in the area of migratory birds, yet he testified at length about the apparent inability of the sloughs to hold water. Like Mr. Keller, he compared the slough conditions in the late 1980's with the 1970's, rather than with the early 1920's when the ditch was completed. His testimony regarding the inability of the sloughs to hold water was also in marked contrast to what the court observed on a site visit, discussed briefly below, which took place on the first day of trial.

On October 31, 1994, the court conducted a site visit with the respective parties. Counsel for the parties selected fifteen locations throughout the length of the drain to provide the court with an overview of the entire drain. We also viewed different parts of each of the three sloughs in question. The site visit was particularly helpful and the court briefly notes the following: The court observed standing water throughout the length of the meandering ditch which varied in width from three or four feet to as much as ten or twelve feet. There were no discernible irregularities in the elevation of the drainage ditch bottom throughout its length which was noteworthy to the court, particularly after having viewed the various profile maps which exaggerated vertical variations. Meszaros Slough appeared wet throughout with some standing water. Big Slough was not accessible by road but the group did walk to the lower perimeter from the south and the ground became increasingly marshy and wet. To the north, Bruns Slough was inundated with water both to the north and south of Highway 13. The court did not observe any farming activity taking place within the sloughs in areas described above by Mr. Keller and Mr. Winter as having been farmed after the work in the 1980's. Above average precipitation in 1993 and 1994 has restored the water levels in the sloughs from the dry period of the 1980's, and has prevented recent farming in these areas. The court also observed a large number of white birds, presumably swans, in the wetlands, particularly in Meszaros and Bruns Sloughs. The court notes, upon review of the countless number of photographs presented at trial, and upon review of notes taken during the site visit, that the wetland areas of all three sloughs appear consistent over time. Water levels fluctuate within these wetlands but the outer boundary of the sloughs, which the court referred to during the course of trial as the "high water mark," is always clearly delineated. Any farming, whether it be haying or cropping, is temporary and will give way to the waters of the sloughs during periods, such as now, of high precipitation.

## DISCUSSION

As noted above, the Act prohibits the discharge of dredged or fill materials into "waters of the United States"—unless authorized by a permit issued by the Corps pursuant to 33 U.S.C. § 1344. *See generally,* 33 U.S.C. § 1311, 1344. Limited exemptions from the permit requirement are found in § 1344(f). The court, in construing the statute, first asks "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense*

*Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694, *reh'g. denied,* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984). In the present instance, because congressional intent is clear from the plain language of the statute, this court must give effect to that intent.

■ The court previously noted in its Order dated September 20, 1994, that reviewing courts have consistently held that § 1344 exemptions be narrowly construed in order to avoid adverse impacts on wetlands. *See United States v. Huebner,* 752 F.2d 1235, 1240–41 (7th Cir.), *cert. denied,* 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 50 (1985); *United States v. Akers,* 785 F.2d 814, 819 (9th Cir.), *cert. denied,* 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986); *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 926 (5th Cir.1983); *United States v. Cumberland Farms,* 647 F.Supp. 1166, 1176 (D.Mass. 1986), *aff'd,* 826 F.2d 1151 (1st Cir.1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 981 (1988). The Third Circuit recently embraced this view as well. *See United States v. Brace,* 41 F.3d 117 (3rd Cir. 1994). A defendant claiming an exemption under 33 U.S.C. § 1344(f), bears the burden of proving that its activities are exempt from regulation. *Akers,* 785 F.2d at 819 (9th Cir.), *cert. denied,* 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986); *United States v. Larkins,* 657 F.Supp. 76, 85 (W.D.Ky.1987), *aff'd,* 852 F.2d 189 (6th Cir.1988), *cert. denied,* 489 U.S. 1016, 109 S.Ct. 1131, 103 L.Ed.2d 193 (1989); *Cumberland Farms,* 647 F.Supp. at 1176 (D.Mass.1986), *aff'd,* 826 F.2d 1151 (1st Cir. 1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 981 (1988); *Brace,* 41 F.3d 117 (3rd Cir.1994). "To be exempt from the permit requirements, one must demonstrate that proposed activities both *satisfy* the requirements of § (f)(1) and *avoid* the exception to the exemptions (referred to as the 'recapture' provision) of § (f)(2)." *Akers,* 785 F.2d at 819 (emphasis in original). Thus, even if a defendant establishes that the activity falls within one of the categories listed in 33 U.S.C. § 1344(f)(1), the defendant must also demonstrate that the activities avoid being "recaptured" under the provisions of § 1344(f)(2). *Brace,* 41 F.3d 117 (3rd Cir. 1994). In the present instance, the County must show that the work it directed was for the maintenance of a drainage ditch, and that this work also avoided being recaptured under subsection (f)(2).

### *"MAINTENANCE" UNDER 33 U.S.C. § 1344(f)(1)(C)*

■ The exemption from the permit requirements under 33 U.S.C. § 1344(f)(1)(C) for "maintenance of drainage ditches" applies to "any discharge of dredged or fill material that may result from ... the maintenance (but not construction) of drainage ditches." 33 C.F.R. § 323.4(a)(3). The recorded history of Drain 11 is extensive. It was originally constructed over seventy years ago and exists today in the same location. The government does not argue that any of the work involved the "construction" of a new drainage ditch. Here, the essential question is whether the work was "maintenance", or whether it went beyond maintenance and was actually an "improvement". The government argues that the County failed to show the work it directed constituted maintenance; that aside from work it did on culverts and bridges along the drain over the years, there was no evidence the County conducted any maintenance or clean-out of the drain prior to the 1980's work; that Garrison Diversion, which was first discussed in the 1960's, does not provide the County a valid explanation for why there was no maintenance of the drain; that when the work was finally done in the 1980's, the contractor deepened the drain below original elevations in some areas and improved on its original efficiency; and therefore, the County failed to prove the work constituted maintenance as opposed to improvement.

The County argues it met its burden of proving that the work it directed was maintenance only, not improvement. It asserts the drain was maintained at least minimally throughout its history and has performed a drainage function. The County notes it was denied funding by the State of North Dakota because the State deemed this a maintenance project, and the State does not fund maintenance projects. This was verified by members of the North Dakota State Water Commission. The County further notes it direct-

ed the contractor to perform maintenance work only, and that the contractor confirmed this directive. It argues that the contractor, a reputable drag-line operator in the tri-state area, followed the directive and performed the work within industry standard tolerance levels. The County argues that although the work was not completed to perfection, under the Act, perfection is not required. This court agrees.

It is clear on the record that the work directed by the County was for the purpose of maintaining an existing drainage ditch. Several board members, the engineer charged with developing a profile of the ditch as it existed upon its completion in the early 1920's, and the contractor who did the work, all testified that the work involved the maintenance of an existing drain. The court was impressed with the credibility of each of these witnesses. The state, which denied funding for the project because it was not new construction, also determined that this was a maintenance project. The court notes that several experts who reviewed the work after it was complete were very helpful. Dr. Frick, who testified on behalf of the government, offered particular insight through his evaluation of the drain's hydrological efficiency at different times through the use of computer modeling. However, after reviewing all the testimony and evidence presented, the court's views may be summarily stated:

> The County set out to clean-out an existing drain. It hired an engineer to profile the bottom of the drain as it was originally constructed. The engineer, using all of the information available, arrived at his best estimate of an "as-built" survey. The survey wasn't perfect, but neither was the information available to him. The contractor relied in part on this survey, but mostly used good judgment, which also was not perfect, to perform the work within accepted engineering standard tolerance levels. At the completion of the work in the 1980's, the ditch was returned to its pre-existing depth. No deepening or widening had taken place and except for the natural erosion of sideslopes over the years, the ditch had been returned to its original configuration. Another survey was conducted after the work was completed and

though it was helpful, it was not perfect. Several experts on each side then attempted to analyze this enormous volume of mostly accurate, but imperfect data, to arrive at conclusions that differed. It is the court's observation that all the individuals involved in the clean-out of Drain 11 were competent and acted responsibly in carrying out their assigned tasks. Their actions were consistent with the stated intention of maintaining the drain. They were not perfect but, under the Act, perfection is not required.

The court concludes that the County's objective of cleaning out the drainage ditch was accomplished. The work was maintenance.

The government suggests additional reasons for this court to find a permit violation. First, that the line of cases previously noted which held that § 1344 exemptions be narrowly construed in order to avoid adverse impacts on wetlands, necessitates a finding by this court that a permit violation has occurred. Secondly, even if the work is construed as being maintenance, the County rested on its rights by waiting so long to clean out the drain. These arguments will be addressed in turn.

As to the line of cases narrowly construing the § 1344 exemptions, a review of those cases highlights several factual distinctions. In *Huebner,* the court was faced with farmers who had entered into a consent decree with the Army Corps of Engineers regarding the maintenance of wetlands on their property and who later violated the decree and were found in contempt by the lower court. *United States v. Huebner,* 752 F.2d 1235 (7th Cir.), *cert. denied,* 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 50 (1985). The Huebners acquired 5,000 acres of the largest continuous area of wetlands in Wisconsin, with the intent of expanding the cranberry operations located thereon and to use a portion of the land for growing vegetables and other upland crops. *Id.* at 1237. Initially, they began to plow sections of the farm to clear out existing ditches and dig new ones. *Id.* The Corps objected to the work as being in violation of the Act and filed a complaint against the farmers. *Id.* at 1238. The parties settled

the action by entering into a consent decree approved by the district judge which essentially prohibited the farmers from discharging dredge or fill materials into the wetlands except in accordance with a Corps permit issued under the Act. *Id.* The district court, finding that the farmers subsequently "used backhoes to clean and deepen existing ditches ... and used a dragline to excavate a[] ... new ditch," which resulted in the reservoirs being drained, and further, had plowed and removed reservoirs and leveled dikes in these reservoirs to decrease the capacity of the soil to store water in preparation for the immediate planting of barley and other crops, found the farmers in contempt of it's order and in violation of the Act. *Id.* at 1242. The Seventh Circuit affirmed, finding that this activity constituted a discharge of dredged material onto a wetland, thereby disturbing the reach of its waters. *Id.*

In *Akers*, the court was faced with the "normal farming" exemption in a case where the defendant had constructed a three-mile long dike through certain wetland areas, which the defendant attempted to characterize as the construction of an irrigation facility under 33 U.S.C. § 1344(f)(1)(C). *United States v. Akers*, 785 F.2d 814, 820 (9th Cir.), *cert. denied*, 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986). The court first noted the § (f)(1)(C) exemptions and the § (f)(2) "recapture" provision, and then held it is "[i]rrelevant how [the defendant] characterizes the dike. Provided the structure has the effect of keeping water from the southern wetlands, its construction requires a permit." *Id.*

The Sixth Circuit used similar reasoning in *United States v. Larkins*, 657 F.Supp. 76 (W.D.Ky.1987), *aff'd*, 852 F.2d 189 (6th Cir. 1988), *cert. denied*, 489 U.S. 1016, 109 S.Ct. 1131, 103 L.Ed.2d 193 (1989). The defendants in *Larkins* acquired 550 acres of land located in the floodplain of a creek, and after the acquisition, dug drainage ditches, cut timber, blasted beaver dams, and began building dikes and levees, and filling low spots on the land. *Id.* In reviewing the farmers' attempt to utilize the "farming exemption," the court determined that the defendants performed these activities "for the

purpose of bringing the wetlands adjacent to Obion Creek under cultivation, a use to which the site was not previously subject." *Id.* at 85–86.

In *Cumberland Farms*, the First Circuit affirmed the lower court's conclusion that a project designated to convert approximately 2,000 acres of a previously unfarmed area known as the "Great Cedar Swamp" by constructing new ditches and removing trees, to dry land farming was not exempt. *United States v. Cumberland Farms*, 647 F.Supp. 1166, 1176 (D.Mass.1986), *aff'd*, 826 F.2d 1151 (1st Cir.1987), *cert. denied*, 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 981 (1988). The lower court noted there was no persuasive evidence the land was previously farmed so the "established and continuing" farming exemption did not apply. *Id.* at 1175. The court further noted that even if the exemption applied under 33 U.S.C. § 1344(f)(1), the activities would not have avoided "recapture" under subsection (f)(2). *Id.*

The Third Circuit also recently addressed both the "normal farming" and the "maintenance of drainage ditch" exemptions under 33 U.S.C. § 1344(f)(1). In *United States v. Brace*, 41 F.3d 117 (3rd Cir.1994), the court noted the defendant admitted that " 'modifications to the hydrological regime,' i.e., drainage of the site through excavating and burying four miles of plastic tubing for drainage, were necessary to grow crops on the site." *Id.* It concluded that the normal farming exemption did not apply because the defendant converted a thirty-acre site that was not suitable for farming into one that is, and thus "brought an area into farming use." *Id.* The court also concluded that the excavation of the site and burying of four miles of pipe to facilitate drainage did not constitute "continuing maintenance" under the Act. *Id.*

There are important factual differences between these cases and the one presented here. In each of these cases in which the defendants claim a normal farming or drainage ditch exemption under § 1344(f)(1)(A) or (C), the defendants were undertaking a large-scale conversion of a wetland area by removing existing vegetation, depositing dredged or fill material into low-lying areas in an attempt to convert the areas to agricul-

tural use, or constructing drainage ditches in order to remove water from wetlands. In each of these cases, large amounts of dredged or fill material was redeposited within the wetland for the clear purpose of converting the wetland. In most instances, the defendants had recently acquired the property in question and were attempting to add value to the land. Although each of the defendants stated a purpose facially worthy of an exemption, it was clear by their actions that the only "purpose" each had was to circumvent the Act.

The facts in the instant case are different. There was an existing ditch and the County wanted it cleaned out. Rather than approach the project haphazardly, it hired an engineer to determine the original depth, and it hired and directed a reputable contractor to perform clean-out maintenance work only. Indeed, it applied to the state for funds but was denied because it only involved maintenance. The court has previously noted that the stated purpose was confirmed by the actions of those who performed work on the drain. Furthermore, the ditch had existed for a long period of time and the County, for the people it serves, was not "adding value" as much as it was preserving a beneficial ditch that had been built long before the Act was promulgated.

As noted previously, reviewing courts have consistently looked beyond the stated or subjective intentions and determined the effect or "objective" purpose of the activity conducted. In this case, the "objective" purpose was consistent with the County's stated intentions.

■ The government also argues the County was not diligent in its maintenance of the drainage ditch, and should now be estopped from cleaning it out. In its Order dated April 6, 1992, the court defined "original" condition as 1) the depth and width of the ditch as it was originally constructed, plus 2) any improvements made to any segments of the ditch prior to the Act's jurisdiction over wetlands in 1975. *See also, United States v. Southern Investment Co.,* 876 F.2d 606, 613 (8th Cir.1989) (work performed prior to CWA jurisdiction over wetlands is grandfathered). It follows, and the government recognizes, that any laches or estoppel argument can only be made for the time period following enactment of the Act in the mid-1970's.

The County is entitled to maintain the ditch it originally constructed. Initially, maintenance was not needed as the entire area became dry as a result of the drought in the 1930's. Eventually, higher precipitation brought water levels in the sloughs back which necessitated periodic maintenance (or repairs) of the ditch. This primarily involved replacing bridges with culverts. In the late 1950's and early 1960's, the government included Drain 11 in its Garrison Diversion Project discussions. In fact, records from the North Dakota State Water Commission from 1963 indicate it was of the view it would be difficult to spend any money either cleaning out or improving the ditch until the scope of Garrison Diversion was known. In the 1970's, the Clean Water Act was promulgated and Garrison Diversion was failing to materialize. The County, having determined that the government would not be doing any work on Drain 11, explored its options in the late 1970's and early 1980's. Concluding that improving the drain would be financially prohibitive, it decided to conduct a clean-out instead. The County applied to the state, was denied, and decided to proceed nonetheless.

■ As a governmental entity serving constituents, the County did what any local governmental body should do when faced with a similar situation: It acted only after the federal government decided not to go forward; it explored all its options, including state funding; it then decided on the most cost-effective alternative available, and directed the completion of the work in a timely fashion. Given the particular facts present here, it is clear to the court that the County neither abandoned the drain nor rested on its right to maintain it. Rather, it acted prudently in the maintenance of Drain 11. Furthermore, while regulations that supplement the statutory framework exist for other exemptions under 33 U.S.C. § 1344(f)(1), none deal with the maintenance of drainage ditches under subsection 1344(f)(1)(C).

The regulations that accompany subsection 1344(f)(1)(A) require that eligible farming activities be a part of established, on-going operations to be eligible for an exemption.[2] Similarly, the regulations that accompany subsection 1344(f)(1)(B) specify that in order to utilize the maintenance of currently serviceable structures exemption, it must occur within a reasonable period of time after damage occurs.[3] However, the regulations pertaining to the maintenance of drainage ditch exemption under subsection 1344(f)(1)(C) do not contain an "on-going" requirement. Rather, the regulations simply restate the statutory language and clarifies what work is covered under the statute.[4] Therefore, the only relevance in inquiring into whether there has been ongoing maintenance of the drainage ditch is for the purposes of subsection 1344(f)(2)'s change in use requirement.[5] This is known as the "recapture" provision and will be discussed below.

In summary, the breadth of the evidence presented at trial as well as the credibility and consistency of the individuals who conducted the work on the drain, convinces this court that the work conducted on Drain 11 in the 1980's was for maintenance purposes, and not to improve the drain. The court finds that the County has met its burden of proof on this issue.

### RECAPTURE UNDER 404(f)(2)

■ The court, having found that the County met its burden of proof on the maintenance issue, now turns to the "recapture" provision. This provision provides that:

Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its primary purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

33 U.S.C. § 1344(f)(2). As noted previously, reviewing courts have utilized this provision to narrowly construe the § 1344(f)(1) exemptions. *See United States v. Huebner,* 752 F.2d 1235, 1240–41 (7th Cir.), *cert. denied,* 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 50 (1985); *United States v. Akers,* 785 F.2d 814, 819 (9th Cir.), *cert. denied,* 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986); *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 926 (5th Cir.1983); *United States v. Cumberland Farms,* 647 F.Supp. 1166, 1176 (D.Mass.1986), *aff'd,* 826 F.2d 1151 (1st Cir. 1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 981 (1988); *United States v. Brace,* 41 F.3d 117 (3rd Cir.1994).

■ The situation in the present instance, unlike any addressed previously, is that Drain 11 has a well documented history which dates back to 1917. Completed in the early 1920's, the ditch drained the water from the sloughs. The sloughs as wetlands remained, however. The sloughs would fill with water in periods of high precipitation, and drain entirely in periods of drought, such as in the 1930's. In times of drought or low precipitation, farmers took advantage of the opportunity to put some of the land within the sloughs to use, mainly by haying. In times of high precipitation, such as now, water levels prevent the use of any of the land for farming. Regardless of the water levels, photographs spanning decades clearly delineate the boundaries of the sloughs. The sloughs are wetlands but the question under

---

**2.** 33 C.F.R. § 323.4(a)(1)(ii). The regulation further states: "An operation ceases to be established when the area on which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operations." *Id.*

**3.** 33 C.F.R. § 323.4(a)(2).

**4.** 33 C.F.R. § 323.4(a)(3). The regulation provides: Construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance (but not construction) of drainage ditches. Discharges associated with siphons, pumps, headgates, wingwalls, weirs, diversion structures, and such other facilities as are appurtenant and functionally related to irrigation ditches are included in this exemption. *Id.*

**5.** For an in depth review of Section 404(f) of the Clean Water Act, *See* Benjamin H. Grumbles, *Section 404(F) of the Clean Water Act: Trench Warfare Over Maintenance of Agricultural Drainage Ditches,* 17 Wm. Mitchell L.Rev. 1021 (1991).

§ 1344(f)(2) is did the 1980's work "bring an area of navigable waters into a use to which it was not previously subject and where the flow of the waters is impaired and their reach reduced[?]" The answer is it did not.

The court has determined the work constituted the maintenance of a drainage ditch that was originally completed in the early 1920's. For purposes of the maintenance analysis and for purposes of the present analysis on the "recapture" provision, that is the base time period. Indeed, the trial was replete with information and exhibits from the respective parties which dated back to the 1920's. The County and the government each argued their cases based on this premise.

While reviewing snapshots of the area immediately before and after the 1980's work may suggest otherwise, this would fail to take into account the low rainfall during that time period, and more importantly, it is not the relevant comparison. The relevant comparison is between the area after the 1980's work, and the area as it existed after the completion of the drain's construction in the early 1920's. Opinions were given at trial that the work may have impaired the flow of the water, but because the data relied upon was complex and the time span so long, the court was not impressed with the credibility of these opinions. The placement of excavated material on top of old spoil piles from previous work did not affect the flow, and, after hearing and evaluating several witnesses, reviewing reams of exhibits, and seeing the sloughs firsthand, the court concludes that the sidecasting of excavated material within the sloughs had a very minor, infinitesimal affect on the flow or reach of the waters. Nature certainly had a much greater effect in this regard. The reach of the waters also changed periodically in dry times and in wet times, but the outline of the wetlands remains. Thus, the permanent reach did not change. Therefore, the court finds the County met its burden of showing that the 1980's work did not "bring an area of navigable waters into a use to which it was not previously subject and where the flow of the waters is impaired and their reach reduced."

As a final note, the court must reiterate its dismay at how the parties handled this case. In the court's view, this case was brought by the government as an opportunity to establish precedent, rather than to resolve a true controversy. That is wrong. It became a matter of principle for litigants on each side who expended tremendous amounts of effort, time, and taxpayer money preparing for trial. The information truly necessary to decide this case could have been prepared and presented much more economically.

The emotion involved was obvious. From witnesses with deep-rooted beliefs, to how the attorneys presented the matter, there was a righteous indignation permeating the trial. It is good to believe in a cause and it is good to believe in the job to be performed, but the conduct of governmental officials on both sides has been offensive. This litigation resulted from an inability to work cooperatively, and both parties bear some fault for the breakdown in communications. Both parties are governmental entities which have a duty to reasonably match the resources they expended on this litigation to its complexity and value. However, there was no serious assessment of the lawsuit by these governmental officials nor proper accountability to the taxpayer. In the court's view, there was no effort to exercise good judgment in equating the expense of the case with the possible results. The failure of the parties to prevent or resolve this dispute and their extravagant approach to trial preparation resulted in a significant waste of the taxpayers' money. This kind of conduct by governmental officials is simply offensive.

Notwithstanding the court's comments in this regard, the law, as Congress has directed and appellate courts have decided, dictates this court's determination.

### CONCLUSION

The court recognizes that the objective of the Clean Water Act is to maintain the integrity of the Nation's waters. Congress intended to preserve wetlands by prohibiting the discharge of fill material. It wanted to protect an invaluable resource. This court agrees with and applauds that objective.

However, adopting the government's position on the facts now before this court, would, in this court's view, extend the effect of the Clean Water Act beyond the purpose Congress intended. The County has properly demonstrated that the work it directed on Drain 11 was maintenance, and that this work was not "recaptured" under 33 U.S.C. § 1344(f)(2). **THEREFORE,** the court hereby finds that the work was **EXEMPT** from permit requirements. All other motions now before the court have been considered and are hereby **DENIED.**

**IT IS SO ORDERED.**

### *JUDGMENT*

Pursuant to the Memorandum and Order filed and entered on this date, and the court's previous Orders relating to several summary judgment motions leading up to the bench trial, **IT IS ADJUDGED THAT** Plaintiff's complaint and cause of action is hereby **DISMISSED** with prejudice.

**IT IS SO ORDERED.**